## MINERVA McKEE et al. v. J. W. DOWNING, Appellant.

### Division Two, December 14, 1909.

1. **RESULTING TRUST: Necessary Parties: Administrator.** The administrator is not a necessary party plaintiff to a suit brought by the heirs of a deceased wife, to establish a resulting trust in lands against a husband who used the wife's personal property to buy land and wrongfully took the title in his own name alone. Such a suit involves title to real estate, and on the death of the wife intestate her interest therein descended to the heirs, and can never be used by her administrator except, in process of administration, to pay estate debts.

2. ———: ———: **Conversion or Specie: Option.** Heirs of a deceased mother whose property was used by her husband, without her assent in writing, to buy land, who took the title in his own name, have the option to sue for the land, or to sue for a monetary judgment as for conversion. In the former case the mother's administrator is not a necessary party; in the latter, he usually would be the necessary plaintiff, but a case might arise where the heirs also should be joined as plaintiffs.

3. ———: **Defect of Parties: Raised by Motion for Judgment.** A defect of parties plaintiff cannot be raised by a motion for judgment on the pleadings. If the defect is apparent from the face of the petition, it must be raised by demurrer; if the petition is sufficient on its face, the defect must be pleaded in the answer. In no case, can a motion for judgment on the pleadings be made to fill the office of a demurrer or answer.

4. **LIMITATIONS: Heirs: Resulting Trust in Land.** Section 4281, Revised Statutes 1899, providing that "if any person so entitled to sue die before the expiration of the time herein limited for the commencement of such a suit, if such cause of action survive to his representatives, his executor or administrator may, after the expiration of such time, and within one year after such death, commence such action, but not after that period," is to be read in connection with section 4279, which provides that "if any person entitled to bring an action in this article specified," etc., and that article applies and has always applied to personal actions alone, that is, to "civil actions other than the recovery of real property." Section 4281 has no reference to a suit by heirs to have a resulting trust declared in their favor in lands purchased by the property of their deceased mother, but wrongfully deeded to defendant.

McKee v. Downing.

5. ———: ———: ———: **Married Woman: 24 Years.** Under section 4265, R. S. 1899, an action to establish her right in land is not barred to a married woman for twenty-four years from the time the cause of action accrued, if she were under coverture at the time it did accrue and continued thereafter the wife of the same husband; and under section 4267, if such married woman die intestate while under the same coverture and within twenty-fours years after said cause of action accrued to her, her heirs have three years after her death to bring their action. So that where plaintiffs' mother was married to defendant in 1881, and in 1883 defendant used her property to buy land and took the title in his own name, she had twenty-four years after she had knowledge of his wrongful act to bring suit to have a resulting trust declared in her favor, and as she died intestate in 1903, her heirs had three years thereafter to bring their suit to have such resulting trust in the land declared in their favor.

6. ———: **Not Shown by Record.** Where there is nothing in the record to show when the suit was brought, it will not in any event be held to have been barred by limitations, on defendant's appeal.

7. **TESTIMONY: Equity Case: Failure to Rule on Objection.** In an equity case the exclusion of competent testimony, or the admission of incompetent testimony, ordinarily is of no great concern on appeal, if the evidence is so preserved that the appellate court can have it all before them, for then the court can consider it for what it is worth, and can exclude it or consider it admitted. And in some cases the court will determine whether or not the testimony was competent, though the chancellor made no ruling when objection to its competency was offered, and appellant saved no exception to his failure to do so.

8. **HEIRS OF DECEASED PARTY: Competency: Resulting Trust.** Plaintiffs, who are children of a wife whose property was used by defendant to purchase land, taking the title in his own name, and who bring this suit after the death of their mother intestate, to have a resulting trust declared in their favor, were competent to testify as to the ownership and value of the property so used. They are not disqualified by the letter of section 4652, Revised Statutes 1899. The words of that statute disqualify those "whose right of action or defense is derived" to them through the living defendant, not those who claim through the deceased wife.

9. **RESULTING TRUST: Character of Proof.** The proof to establish a resulting trust in lands should be clear, cogent, positive and convincing, and leave no doubt that the property of

plaintiffs, or of their ancestor, was used to buy the land. And where plaintiffs' mother and defendant lived in peace, as husband and wife, for nearly twenty years after he used her stock to buy the land and took the title in his name, and during all that time she brought no suit, and did nothing to have the title vested in her, the court should be satisfied that the matter was not really settled by them; for it should be remembered that he cannot testify, and that they do not deal with each other as strangers.

10. ———: ———: **Reimbursement.** Although the evidence clearly shows that the colts which defendant used to pay for the land which was deeded to him once belonged to plaintiffs' mother, yet if it also shows that she had previously given them to her minor son and that the defendant subsequently satisfied the son by giving him another horse, that ought to be considered a settlement between defendant and his wife, the mother, and the resulting trust should not be declared.

11. ———: ———: **Value of Land.** Though the evidence clearly shows that the colts used by defendant to buy the land belonged to plaintiffs' mother, and shows their value, yet if it fails to show the value of the land, a decree vesting title in plaintiffs cannot stand. And testimony that the grantor "always asked ten dollars an acre for the land" is not evidence of its value. And though the law does not require the proof as to the value of the land to be of that clear, cogent, positive and convincing character necessary to establish the resulting trust itself, it does require it to be substantial.

Appeal from Nodaway Circuit Court.—*Hon. Wm. C. Ellison,* Judge.

REVERSED AND REMANDED.

*J. H. Sayler* and *Funk & Crawford* for appellant.

(1) The administrator of the estate of Susanna Downing, deceased, was a necessary party plaintiff to the action. McMillan v. Wacker, 57 Mo. App. 220; Adey v. Adey, 58 Mo. App. 408; Butler v. Lawson, 72 Mo. 227. (2) Plaintiffs' cause of action, if any existed, was barred by the Statute of Limitations. Sec. 4281, R. S. 1899; Rosenberger v. Mallerson, 92 Mo. App. 27. (3) Plaintiffs cannot, by electing to take a resulting trust in lands, growing out of the investment of person-

al property in said lands, evade the running of the statute of limitations, applying to suits brought for the recovery of specific personal property or to establish rights growing out of controversies regarding personal property. Keeton v. Keeton, 20 Mo. 530; Landis v. Saxton, 105 Mo. 486. (4) It is the settled rule, in this State, that a resulting trust will not be declared unless the evidence is clear, strong, unequivocal and so definite and positive as to leave no room for doubt in the mind of the chancellor. McMurray v. McMurray, 180 Mo. 526; Curd v. Brown, 148 Mo. 92. (5) Where the value of property used by defendant in the purchase of land, is not established, a resulting trust will not be declared. Garrett v. Garrett, 171 Mo. 155. (6) A resulting trust attaches in the ratio of ownership, and where the price paid or the present value of the land is not proven, a resulting trust cannot be declared. Shaw v. Shaw, 86 Mo. 594; Perry on Trusts (5 Ed.), par. 126; Baumgartener v. Guessfeld, 38 Mo. 37; In re Ferguson's Estate, 124 Mo. 574. (7) Where the relation of husband and wife exists, and during the coverture, the husband uses the wife's separate property, in the purchase of land, she can only have a resulting trust declared for such share of the land so purchased, as the principal sum of her money so used by the husband, bears to the present value of the said land. Bank v. Winn, 132 Mo. 81. The judgment will be simply reversed without remanding, where there is no evidence to sustain the verdict or judgment. McCartney v. Finnell, 106 Mo. 445.

BURGESS, J.—This is a controversy over the ownership of a forty-acre tract of land in Nodaway county, Missouri.

The petition states in substance that on the—day of June, 1876, Thomas Byrn died intestate, leaving a large amount of real and personal property, and leaving as his only heirs and legal representatives his wid-

ow, Susanna, and his children, the plaintiffs, as follows: Minerva Byrn, since intermarried with Joseph McKee; Fannie Byrn, since intermarried with J. T. Wells; Cornelia Byrn, since intermarried with Robert McKee, and Perry and Thomas Byrn. That afterwards, on the 14th day of January, 1881, the said Susanna intermarried with J. W. Downing, the defendant, and that at the time of her said marriage she was seized and possessed in her own right, as her separate property, of certain real estate and personal property, the latter consisting of horses, cattle, hogs, money, notes, etc., of the value of three thousand dollars; that from the date of her said marriage, the defendant, without authority, and without her express assent in writing, assumed the management and control of her said personal property, and wrongfully withheld possession of the same from her; that on November 8, 1883, the defendant purchased from one A. L. Rogers, for a consideration of $400, a tract of land situated in Nodaway county, described as the southwest quarter of the southeast quarter of section 31, township 67, range 33; that the said land so purchased by the defendant was paid for with the separate property, money and means of his wife, the said Susanna, without her assent in writing, and that the defendant took title to said land in his own name without her knowledge or consent; that said Susanna Downing died intestate in the county of Nodaway on September 14, 1903, leaving as her sole heirs and legal representatives these plaintiffs; that the defendant wrongfully withholds the possession of said real estate from the plaintiffs, as the heirs of their mother, the said Susanna. The prayer of the petition is that the court declare the said real estate to have been the separate property of the said Susanna Downing, and that it be decreed that the defendant held the same in trust for her, and since her death, to hold the same for and to the use of the plaintiffs, as her heirs, and that the defendant be divested of the title of said

real estate, and the same be vested in the plaintiffs, and that the defendant be declared a trustee for and to the use of the plaintiffs as to the real estate so purchased and held by him.

Defendant filed a motion for judgment on the pleadings for the reason that plaintiffs failed to make the administrator of Susanna Downing, deceased, a party plaintiff to the action, which motion was overruled by the court.

Thereafter defendant filed his answer, denying the allegations of the petition, and alleging that "the cause of action, if any, stated in plaintiffs' petition, is barred by the Statute of Limitations, in that suit was not brought within one year after the death of the said Susanna Downing."

Defendant then objected to the introduction of any testimony in the cause, for the reasons stated in his answer and motion for judgment on the pleadings, which objection was overruled.

Jasper Dowis, a brother of Susanna Downing, testified for plaintiffs that at the time of said Susanna's marriage to Downing she possessed about thirty or thirty-five head of cattle, a span of mares and a span of colts. He did not know what Downing paid for the land purchased from Rogers, nor did he ever talk to Downing about it.

John King testified that Mrs. Downing possessed considerable live stock at the time she married Downing, the same consisting of horses, cattle and hogs; that she had a team of colts worth probably $250; that he did not remember the circumstances of the purchase of the Rogers land; that he had once heard Mrs. Downing say to her husband that "he traded her property for land. She didn't say what land—her stock."

Cornelia McKee, a daughter of Mrs. Downing, testified that she was about eight years of age at the time of her mother's marriage to Downing. As to the purchase of the land in controversy she testified that she

had heard her mother say to Downing "that he bought that place with her stock—her property," and that Downing, in answer to such statement of her mother, "would never say nothing much about it."

Minerva McKee testified that she was a daughter of Mrs. Downing, and was about sixteen years of age at the time of the latter's marriage to the defendant. She also testified as follows: "At the time of her marriage to Mr. Downing she had quite a bunch of hogs, and she had 36 head of cattle and four head of horses, and I see her have $400 in the house. I remember the circumstance of his buying what is called the Rogers forty. I don't know the purchase price exactly. He paid for it in stock—my mother's. There was a team of colts went in on that, and three cows. Never heard my mother say, in the presence of Mr. Downing, anything about how the land was paid for. Mr. Downing had, when he was married to my mother, forty acres of land, with a small house on it, and twenty acres of timber. Mr. Downing and my mother and their families lived on the farm of 360 acres which had been left by my father."

Fannie Wells, another married daughter and heir of Mrs. Downing, testified that she knew that two colts and some other stock owned by her mother went in on the trade between Downing and Rogers. She had heard her mother, time and again, say that the stock that was traded for the land was hers. In answer to a question as to whether Downing was present when she heard her mother say that, she answered, "I am not positive, but I have an idea he was present when it was talked."

David Rogers, son of A. L. Rogers, testified that he remembered something of the trade between his father and Downing. "My father got two head of horses, and my recollection is that he got four or five head of cattle. As I remember now, the best horse would have been worth $100 anyway—I should have thought.

The other was a young horse, a colt; I don't know really what it would have been worth.'' As to the value of the land, witness stated that his father always asked ten dollars an acre for it. He knew about the trade, saw the stock on the place, and heard his father say that he got it from Downing, but he did not know of his own knowledge whom the stock belonged to before it came into his father's possession. He never heard Mr. Downing say anything about it.

Eldridge Rowe testified for plaintiffs, as follows: ''I was present at the home of Mr. Downing and his wife a couple of years after their marriage, and at the time when Mr. Rogers came there to trade this forty acres of land in controversy for some stock that Mr. Downing had there. I went out with them and looked at the horses; but they was talking about some cattle, and asked me to go along, and I told them, 'No, it was getting late, and I must go.' So I went home and didn't see the cattle at all. Q. What horses was it that they were trading? A. It was a couple of young horses that was on the place there that belonged to the woman —I mean his woman, Mrs. Downing. I knew the colts the time they were foaled. They were out of mares that belonged to Mrs. Downing, which she had during her widowhood, and I think the colts were on the place at the time of their marriage. At that time and place, I think, in my best opinion, the mare would have been worth a hundred dollars, or may be a little upwards— that is the filly. The horse—he was kind of crooked-legged, you know. I think $75 or $80 would have been a good price for him. Now, I wouldn't say that was really what they were worth, but that would be my opinion. The land trade was not finally made in my presence. I knew Mr. Downing got possession of the land right straight, and he told me himself that he traded. I don't know anything about the cattle being traded in on the land.''

Perry Byrn, a son of Mrs. Downing, testified that

he remembered the trade in question, and that Mr. Downing traded two of his mother's horses in on the land; that he was small at the time, and didn't know anything further about the trade. He didn't know how old the horses were, but that one of them was crooked in the legs. He claimed the mare since it was a foal, but he didn't know whether it was his or not. "Q. Mr. Downing afterwards gave you a horse, did he not, in place of it? A. No, sir, I don't know whether he gave it to me in place of that one or not. He gave me a horse. I don't know anything about and wasn't present when the trade was made. I don't know just exactly what price was put on the horses when they were traded away. I don't know what other stock went in, or whether Mr. Downing paid the balance in money. I remember about the horses, and that is about all I recollect of. There were five of the Byrn children, three girls and two boys. We children, with our mother, lived there and grew up as a part of the family of Mr. Downing, after the marriage. That was our home until we were grown. Q. You tell the court how you happened to get that horse Mr. Crawford has been asking about, from Mr. Downing. A. Well, sir, we had quite a racket over that horse, and he gave me that horse. I went away and worked. Q. He told you, if you would come back and work there, he would give you this horse, didn't he? A. Yes, sir, he did. Q. Now, Perry, that racket you had was because you claimed that the horse he traded away belonged to you, wasn't it? A. I claimed it, and I don't know whether it belonged to me or not."

By the court: "You say you claimed the horse that he traded for this land was yours? A. I claimed the horse. Q. There were two? A. I claimed one of them. Q. How did you claim it? A. Just like any other kid, I suppose."

Oren Stingley testified that prior to the trial he had a talk with the defendant with reference to this

case and the trade in question. "We talked about this case coming up, and we talked about the trade with Mr. Rogers. I don't know just how it come. Anyhow, in the rounds, I says: 'You let two colts and two or three cows go?' He says: 'No, I let the colts and one cow go.' He didn't say whose property it was that he let go. I was talking about the woman's property going in on the land. He said, 'One cow and two colts.' He didn't say whether it was hers or his.'' On cross-examination, this witness testified: "One of the colts was a dandy good mare—a good filly—with one eye knocked out; and the other one was just about as hard the other way. He was a crooked-legged and ill-shaped and ill-formed horse. At that time I would hate to give $25 for him. At that time I expect the mare would be worth about $75 or $100. Perry Byrn claimed the filly. I know Mr. Downing afterwards gave Perry a horse. My understanding was that he gave the horse in place of this filly. In the conversation that I have spoken about with Mr. Downing, he told me that he had given Perry a colt worth both of them." On being asked whether there was anything said in that conversation with relation to the investment or trading of any particular property for any particular piece of land, the witness answered, "No, I don't think there was."

Robert McKee, husband of Cornelia Byrn, testified that he was acquainted with Mrs. Byrn and Mr. Downing prior to and after their marriage; that he used to be about their place a great deal and that he was somewhat acquainted with the stock of Mr. and Mrs. Downing. "Q. Now, calling your attention to the time, did you know of this trade with Mr. Rogers? A. Yes, sir. I met the little gentleman driving this stock away from the place at the time they drove it away that day—that is, Mr. Downing and Mr. Rogers. I met them just west of Mrs. Downing's old home place, and, as near as I can remember, there was five

cattle—three cows, it seems to me, and two yearlings—and two head of horses. They were Mrs. Byrn's horses and cattle. I don't know who the yearlings belonged to. I didn't know whether they were his or hers. Q. They didn't stop and talk to you in the road about the matter, did they? A. Not particular. Oh, I knowed this stuff. Q. You don't know, as a matter of fact, of your own personal knowledge, that this stock was traded for this Rogers land, do you? A. Yes, sir; I heard them talking about making this trade. Q. Who did you hear talk about it? A. I couldn't say. Q. Did you hear Mr. Downing talk about it to Mr. Rogers? A. It was talked in the neighborhood. Q. You didn't hear Mr. Downing or Mr. Rogers say anything about it; you never talked to them about it, did you? A. No, sir." This witness further testified that he didn't see the stock delivered at the Rogers place, and he wasn't told where the stock was going; that he heard about the trade, and met the stock in the road, and that was as far as he knew about the transaction.

At the close of the plaintiffs' case the defendant asked the court to declare the law to be that, under the law and the evidence, the judgment and findings must be for the defendant, which declaration of law the court refused to give, the defendant duly excepting.

The findings of the court were, in substance, that the two colts in question were the property of Susanna Byrn at the time of her marriage to defendant, and that they were used by the defendant in paying for the Rogers land; that said colts were of the value of one hundred and twenty-five dollars at the time of the purchase, and that the land at the time of the purchase was of the value of four hundred dollars; that the defendant held the title to the land so purchased and paid for, in trust for the said Susanna, during her lifetime, and at her death held the same in trust for her heirs, the plaintiffs, and in proportion to the amount of the pur-

chase price which was paid with the property of the said Susanna, to-wit, $125. It was ordered, adjudged and decreed by the court "that the plaintiffs have and recover from the defendant the title, right and interest of defendant in and to the southwest quarter of the southeast quarter of section 31, township 67, of range 33, Nodaway county, Missouri, to the extent of 125-400ths, and that the defendant be divested of the title thereto, and that the same be vested in the plaintiffs, and that plaintiffs recover their costs," etc.

Defendant duly filed his motion for a new trial, which was overruled, whereupon defendant appealed to this court.

Respondents have filed no brief in this case, and in consequence extra work has been imposed upon us— work, which under the circumstances of this case, ought to have been performed by counsel for respondents.

I. Defendant assigns as error the overruling of his motion for judgment on the pleadings. The basis of that motion is that the administrator of plaintiff's deceased mother, through whom they claimed as heirs, was not made a party to the suit. There are two answers to that assignment:

1. Her administrator is not a necessary party. The suit is one by her heirs to establish a resulting trust in land, on the ground that the defendant, her husband, used her separate property to buy the land and took the title to himself. If the evidence clearly shows that fact then he held the title as trustee for her. It was an interest in real estate he so held, and not personal property, and at her death intestate that interest descended to her heirs, and in its recovery, in the absence of estate debts, the administrator is not concerned, and is not a necessary party. The intestate's title to land always descends to his heirs, subject to the paramount right of creditors of the estate to have it sold by the administrator, upon an order

of court, to pay decedent's debts. [McQuitty v. Wilhite, 218 Mo. 586; Thorp v. Miller, 137 Mo. l. c. 238.] It is not charged in the petition that this land is needed to pay Mrs. Downing's debts. Indeed, it nowhere appears in the record that she had any debts at the time of her death, or that any administrator had ever been appointed for her estate, or if there had whether or not he had made final settlement. What possible interest then could he have in the results of this suit? If as a result of it defendant is held to hold the legal title as trustee for plaintiffs, her heirs, and the title is decreed out of him and vested in them, as the judgment attempts to do, then the land would still be subject to Mrs. Downing's debts, up to the time of final settlement by her administrator, and so her administrator would derive every possible benefit from said decree that he could were he a party. On the other hand, if the final judgment declares defendant to be the owner, then the land can never be subject to the payment of her debts, and the administrator would have no right to its use for any purpose. What possible interest of his, as her legal representative, is, therefore, to be conserved by making him a party? We can conceive of none.

Johnston v. Johnston, 173 Mo. 91, was a bill in equity to establish a resulting trust in certain lots, brought by the children of a deceased wife against their foster father, who had used his own and their mother's money to acquire certain lots, and took the title in his own name alone. The court said, page 121: "The heirs, and not the administrator, are the proper parties to prosecute this suit. This is a bill in equity to declare a resulting trust in land, and not an action to recover Mrs. Johnston's interest in personal chattels or for damages for a conversion of a chose in action, and therefore the heirs, and not the administrator, must sue." [See also Broughton v. Brand, 94 Mo. l. c. 175; Richardson v. Cole, 160 Mo. 372.]

Appellant cites the case of Butler v. Lawson, 72 Mo. 227, wherein it was held that the administrators were necessary parties plaintiff. In that case one Gregory, as the administrator of the estate of his wife's former husband and as the administrator of his deceased step-children, had converted the estates, which were in North Carolina, into money, and appropriated them to his own use and moved to Missouri. After his death here the administrators of the heirs of the deceased step-children sued his administrator and heirs in the circuit court for the amount of money so converted. They did not describe any land in their petition, they did not ask that the title to Gregory's land be divested out of his heirs and vested in them, they simply asked for a monetary judgment, and that the lands and personal estate of the deceased Gregory be subjected to the payment of the judgment. The court in disposing of the point of necessary parties, said that the administrators "are proper and necessary parties plaintiff, only so far as concerns the personal estate of their respective decedents. The heirs of those decedents, being interested beneficially, in the final distribution of the personal estate, as well as of the realty, are necessary parties also, and this for two reasons: the one, that they may exercise their equitable option to take the personal and real property in specie if they so desire (2 Story Eq. Jur., supra); the other that all persons materially interested, whether legally or beneficially, in the subject-matter of the suit, should be made parties to it, in order that the decree, when made, should not be grounded upon a partial view of the real merits, but upon a comprehensive survey of the whole case, and of the various and conflicting interests of all concerned, or to be affected thereby."

We agree that those who are the equitable beneficial owners of the fund which has been by another invested in land and who has taken the legal title in himself, have an option to sue for the land itself, or to sue

for the amount of money so converted, with interest thereon from the time of the conversion (Prewitt v. Prewitt, 188 Mo. 675); and if the owner of the fund so converted has died leaving heirs; we can conceive of a case where, in a suit for the conversion of the fund and a monetary judgment, the heirs should be joined with the administrator of the estate as plaintiffs. But we are not called upon to decide that point, for it is not here. This is not a suit for a monetary judgment. The plaintiffs have described a tract of land, and say it was purchased with their mother's money, and that, therefore, she was the real owner, but that defendant wrongfully caused the legal title to be vested in. him, and they ask, as their mother died intestate, and they are her only heirs, that the legal title be vested in them. They ask for nothing more. They have exercised their option to have the court declare a resulting trust in their favor. The trial court by its decree did that, and has not undertaken to render a monetary judgment in their favor, and, in our own opinion, such a judgment could not be rendered without an amendment to the petition praying for it,—either alone, or in the alternative.

2. A defect of parties plaintiff cannot be raised by a motion for judgment on the pleadings. If the defect is apparent from the face of the petition, it must be raised by demurrer; and if the petition is sufficient on its face, as the petition in this case is, the defect must be pleaded in the answer.

It is said in Butler v. Lawson, 72 Mo. 1. c. 247, a case cited by appellant on this point, that: "According to express statutory provision, the objection of a defect of parties can only be taken by a demurrer or answer." [Sec. 602, R. S. 1899; Turner v. Lord, 92 Mo. 113; Crenshaw v. Ullman, 113 Mo. 633; Baxter v. Railroad, 198 Mo. 1, 8; Am. Smelter Co. v. Assurance Co., 71 Mo. App. 658; Meriwether v. Joy, 85 Mo. App. 634.]

224 Sup—9

And by section 658, Revised Statutes 1899, it is provided that "when a complete determination of the controversy cannot be had without the presence of other parties," as made manifest by a demurrer, or answer, "the court may order them to be brought in by an amendment to the petition, or by a supplemental petition and a new summons;" and it was held in Butler v. Lawson, supra, l. c. 247, that "may," in a case like this means "*must.*" A motion for judgment on the pleadings for defendant cannot be made to fill such an office. Defendant is not entitled to judgment upon the mere filing of a petition unless the petition states such facts as clearly show that plaintiff is not entitled to judgment; for instance, that it is clearly barred by limitations. Even if it fails to state a cause of action, its defects may be raised by demurrer, or, if totally defective, by an objection to the introduction of any testimony. Defendant would have us say that plaintiff's petition fails to state a cause of action because Mrs. Downing's administrator is not joined as a plaintiff, and also to render judgment against plaintiffs, without giving them leave to amend or take nonsuit. To sustain defendant's motion would be to hold that final judgment may be rendered by the court, as a matter of law, without trial or testimony, in the face of a petition that on its face states a good cause of action. Such a holding would be anomalous under our practice.

In numerous decisions of late this court has condemned the apparently growing tendency to use motions to fill the office of a demurrer or answer. [Ewing v. Vernon Co., 216 Mo. 681; Hubbard v. Slavens, 218 Mo. 598.]

The point is ruled against appellant.

II. Defendant's next contention is that as the "suit was not brought within one year after the death of the said Susanna Downing," "the cause of action, if any existed, was barred by the Statute of Limita-

tions;'' and in support of that contention they cite section 4281, Revised Statutes 1899, which reads: ''If any person so entitled to sue die before the expiration of the time herein limited for the commencement of such suit, if such cause of action shall survive to his representatives, his executor or administrator may, after the expiration of such time and within one year after such death, commence such action, but not after that period.''

There are three answers to this contention:

1. Section 4281, Revised Statutes 1899, is to be read in connection with section 4279. [Rosenberger v. Mallerson, 92 Mo. App. 27, cited by appellant.] Section 4279 says, ''If any person entitled to bring an action in this article specified,'' etc. That ''article'' applies only to personal actions. It relates to ''civil actions other than those for the recovery of real property.'' [Sec. 4271, R. S. 1899.] Since its first enactment, section 4281 has been a part of the article relating to personal actions and those only. [R. S. 1899, secs. 6779 and 6780; R. S. 1879, secs. 3234 and 3235; R. S. 1855, p. 1049, secs. 10 and 11; R. S. 1845, p. 717, secs. 5 and 6; R. S. 1835, p. 394, secs. 5 and 6.] If this had been a suit to recover from defendant the value of the horses and cattle belonging to Mrs. Downing and used by him in purchasing the land, then said section 4281 might have had some application to the case; but this is not a suit for a monetary judgment. It is a suit for the land, and therefore article one of the chapter on Limitations applies. Besides all this, the party who can maintain the suit under section 4281 is the administrator or executor, and the limitation of one year applies to him.

2. The question of limitation in this case is determined by sections 4265 and 4267, Revised Statutes 1899, which were the same in the Revised Statutes of 1889 and 1879. By section 4265 an action to establish her right to land is not barred to a married woman for

twenty-four years from the time the cause of action accrued, if she were under coverture at the time it did accrue and continued thereafter the wife of the same husband; and under section 4267, if such married woman die intestate while under the same coverture and within twenty-four years after said cause of action accrued to her, her heirs may commence such action within three years after her death. It is stated in the petition and admitted in the answer that Susanna Downing and defendant were married on January 14, 1881; it is shown by the record that on November 8, 1883, the defendant purchased the land sued for and took the title in his own name; and it is stated in the petition and admitted in the answer that the said Susanna, the mother of plaintiffs, died on September 14, 1903. The said cause of action did not and could not have accrued prior to November 8, 1883, and plaintiffs' mother was then under legal disability and while she might have brought her suit at any time after she had knowledge of defendant's wrong, she was not compelled to do so at any time for twenty-four years, if her then coverture lasted that long. She died on September 14, 1903, less than twenty years after the cause of action accrued. Her heirs, the plaintiffs, had three years from that time, or until September 15, 1906, to bring their action. The record does not show when it was brought, but the judgment as set out in the abstract shows that it was rendered on July 9, 1906. The petition must therefore have been filed and the suit brought before that date, or within three years after Mrs. Downing's death. The action was not therefore barred by limitations.

In Reed v. Painter, 145 Mo. l. c. 354, the defendant used his wife's money to buy a farm, and the deed to him was dated March 17, 1874, and Mrs. Painter died April 2, 1884. The court said: ''When John Painter took the deed to the Dorman farm for which his wife had paid the purchase money, without her consent, he

was guilty of a constructive if not actual fraud, and a resulting trust was created in her favor. While a married woman under the fourteenth section of the Married Woman's Act found in the General Statutes of 1865, was not entitled to sue by herself for possession of her lands, that right still remaining in the husband, she had during coverture a right of action for an injury done to her inheritance or the integrity of her fee simple title to her lands just as any other person, and when, as in this case, the very title itself had been wrongfully taken from her by the fraudulent act of her husband, an action in equity accrued to her to have the legal title which was in her husband divested and to have the same restored to herself. Mrs. Painter having died during her coverture, and no determination or judgment having been had of the right of action which accrued to her, her heirs were authorized to commence this action, which had descended to them from their mother, within three years after her death." That decision is based upon an interpretation of sections 4265 and 4267, supra. See also Prewitt v. Prewitt, 188 Mo. 675, 686, where it is held that as to a resulting trust in land a married woman has twenty-four years in which to sue for the recovery of the property.

3. But there is another reason why the one-year limitation provided by section 4281 could not be held to apply to this case, even though it were a personal action seeking for a monetary judgment, as for conversion. It is nowhere shown in the record that the suit was not brought within one year after the death of Mrs. Downing, by these plaintiffs, who are her heirs. There is nothing in the abstract whatever from which it can be determined when the suit was brought. It is pleaded in the answer that the cause of action "is barred by the Statute of Limitations, in that suit was not brought within one year after the death of the said Susanna Downing;" but the answer does not prove itself. The body of the petition is set out in

the abstract, but its caption is not, and from it we cannot discover when this suit was brought, nor is there anywhere anything in the entire record that gives us any information upon the point. We could not therefore hold that the suit was not brought within one year of Mrs. Downing's death, and even if section 4281 were applicable to the case, and we have held it was not, we would not be justified in reversing the judgment on the ground that the action is barred by limitations.

III. The serious question in this case is the sufficiency of the evidence to sustain a decree for plaintiffs. The chancellor found that defendant used two of his wife's horses to pay for the land, without her written consent; that they were at the time worth $125; that the land was at that time worth $400; and the decree invested five-sixteenths of the land in these plaintiffs.

Appellant assigns as error the admission of incompetent evidence. In the course of the trial, while one of the plaintiffs, a daughter of Mrs. Downing, was testifying, the learned chancellor asked of counsel, "On what theory is this a competent witness?" The counsel for defendant then objected to the competency of the witness, and as the trial proceeded objected to any of the plaintiffs testifying, on the ground that "where one of the parties to the transaction is dead the other party to the transaction cannot testify; nor can those who succeed to the deceased be allowed to testify," and the chancellor remarked that "the law has been amended by making this important addition: 'nor shall the representative of the party deceased, or those who hold from, through or under her, be competent to testify,' " but did not rule on the point at the time, but, at the suggestion of the court and by agreement of counsel on both sides, the testimony of this and the other plaintiffs was admitted "with the

understanding'' that the chancellor ''will consider the question when he comes to review the testimony and make his findings.'' No exception was saved at that or any other time. If the chancellor at any time ruled on the competency of these witnesses, the record fails to show it, and hence we cannot tell whether or not he considered their testimony when he came to make his findings of fact.

If this were a law case we would unhesitatingly hold that this court cannot consider the assignment that error was committed in the admission of this evidence, if indeed it was admitted, for the reason that no exception was saved to the action of the court in declining to rule thereon. But this is a suit in equity, and the exclusion of competent testimony or the admission of incompetent testimony by the chancellor is of no great concern on appeal in an equity case, if the evidence is so preserved that we can have it all before us, for we can then consider it for what it is worth and can admit or exclude it ourselves.

On this point it was said by LAMM, J., in Hanson v. Neal, 215 Mo. l. c. 271: ''Defendants assign error on the exclusion and admission of testimony. In this behalf, it must be kept steadily in mind that this is an equity case and that the exclusion or admission of testimony is rarely reversible error in chancery on appeal. The testimony being here, we can seek equity and do it by considering competent proof offered and excluded, or rejecting incompetent proof objected to and received.''

In McCormick v. Parsons, 195 Mo. l. c. 100, we said: ''Defendants also complain of the failure of the court, upon objections made by them to the admission in evidence of the various records and proceedings in former suits, to pass upon such objections at the time. But neither the action of the court in admitting this evidence over the objection of defendants, nor its failure to pass upon the objections, would justify a re-

versal of the judgment, this being an equity case, for in such cases evidence improperly admitted will be disregarded by this court." To the same effect are Jones v. Thomas, 218 Mo. l. c. 544; Gibbs v. Haughowout, 207 Mo. l. c. 391; State ex rel. v. Jarrott, 183 Mo. l. c. 218; Blount v. Spratt, 113 Mo. 54, and numerous other cases. "But," said LAMM, J., in Morrison v. Turnbaugh, 192 Mo. l. c. 442, "this does not mean that the chancellor should not rule on evidence when its admission is challenged, nor does it mean that if the case required it, we would not reverse and remand because of reversible error in allowing proof." [Russell v. Sharp, 192 Mo. l. c. 290.]

We are, therefore, of the opinion that the competency of plaintiffs to testify should be considered by us in this case, though no exception was saved to the failure of the chancellor to rule upon their competency at the time appellant objected to their testifying, or at any other time so far as the record shows.

The learned chancellor announced when the competency of these witnesses to testify was being considered, that the statute which prevents one of the parties to a contract from testifying where the other party is dead, had been amended by the addition of these words: "nor shall the representative of the party deceased, or those who hold from, through or under her, be competent to testify."

The statute has not been amended in many years, certainly not since the death of Mrs. Downing in 1903. That statute, section 4652, Revised Statutes 1899, so far as applicable, reads: "In actions where one of the original parties to the contract or cause of action in issue and on trial is dead . . . the other party to such contract or cause of action shall not be admitted to testify either in his own favor or in favor of any party to the action claiming under him, and no party to such suit or proceeding whose right of action or defense is derived to him from one who is, or if liv-

ing would be, subject to the foregoing disqualification, shall be admitted to testify in his own favor.''

A careful reading of this statute will demonstrate that these plaintiffs were not disqualified to testify unless their deceased mother was. If she had brought suit against defendant during her lifetime, as she had a right to do at any time during her coverture, would she have been disqualified to testify? Certainly not on the theory that she was "one of the original parties to the contract in issue and on trial." The contract for the purchase of the land in suit was between Rogers as grantor and defendant as grantee. She was in no sense a party to that contract, nor is it in issue in this case. As between the parties to it, it is admitted to have been legal—that is, it was a conveyance of land for a valuable consideration from Rogers to defendant, who took (it is undisputed) the legal title. Even though she had made an express agreement with defendant that he might use her separate personal property to buy said land and take the title in his name, her agreement, if not in writing, was void (Sec. 4340, R. S. 1899); and there is no pretense that she gave her "express assent" in writing. So even if such agreement was made by her, that agreement or contract is not "in issue" in this case. The act of defendant, in using her individual property to buy land and in taking the title in his own name, was a fraud (Prewitt v. Prewitt, 188 Mo. l. c. 684; Reed v. Painter, 145 Mo. l. c. 354); and the purpose of this suit is to make him restore what he had fraudulently deprived her of. No contract is in issue in the case.

The words "cause of action in issue and on trial" are more troublesome; but it will be observed that the statute says that "the other party to such . . . cause of action shall not be admitted to testify either in his own favor or in favor of any party to the action claiming under *him*—that is, under the living party (defendant), not under the deceased party. These

plaintiffs do not claim under defendant, but under their mother, and therefore they are not disqualified by this clause.

But the section proceeds: "and no party to such suit or proceeding whose right of action or defense is derived to him from one who is, or if living would be, subject to the foregoing disqualification, shall be admitted to testify in his own favor." This clause is more troublesome, in this case, than the preceding ones. Under it, plaintiffs were disqualified if their mother, had she brought this suit in her lifetime, would have been disqualified to testify in her own behalf; otherwise, they were not. We do not think she would have been disqualified in such case, and hence they were not disqualified. The statute says that their disqualification is dependent upon and "subject to the foregoing disqualification" of their mother; and the foregoing part of the section does not disqualify her, it disqualifies only the living party.

Freeland v. Williamson, 220 Mo. 217, was a suit by Mrs. Freeland against her children, to have a resulting trust declared in her favor, in land which had been bought with money furnished by her father, and which had been deeded, by error or mistake, to her deceased husband. In 1869 Andrew Miller, her father, who lived in Ohio, sent $600 to John Spencer in Nodaway county and directed him to buy the land for his daughter, Mrs. Freeland. Spencer did so and directed the deed to be made to her, but it was made to her husband, and on his death in 1903 she brought suit against her children to have the title vested in her, and at the trial she testified in regard to the source from which the purchase money came, and also that she had never heard that the deed was made to her husband instead of to herself. Judge GANTT, who wrote the opinion, said at page 230: "It is insisted that the court erred in permitting the plaintiff, Mrs. Freeland, to testify in the cause, because her husband was dead.

In Scrutchfield v. Sauter, 119 Mo. 1, c. 624, it was said by this court: 'It has long been the settled law in this State that the statute (sec. 8922) defining the competency of the husband and wife to testify in their own behalf, and for each other, did not intend to exclude the wife from testifying in a case in which she was a real party in interest.' Moreover she did not testify as to any contract with her husband. Her right to the land was not derived through any contract between her and her husband, but depended upon the payment of the money for the land in question by her father for her benefit, under an agreement between her father, Andrew Miller, and John Spencer, to which arrangement her husband was not a party. We think she was clearly a competent witness in her own behalf."

Reed v. Painter, 145 Mo. 341, was a suit by the heirs of Mrs. Painter, brought after her death, to have a resulting trust in certain lands declared in their favor, on the ground that their mother's money or property was used by defendant Painter, their stepfather, in purchasing the land, and that he wrongfully took the title in his own name. Painter was dead at the time of the trial, and so the suit was really against his heirs. Among the plaintiffs was Mrs. Holcomb, one of Mrs. Painter's daughters, and she was permitted to testify. The court said at page 353: "The objection to the competency of Mrs. Holcomb was properly overruled. She was not a party to the original cause of action and the statute in no way affects her right to testify. She was competent at common law and since the statute. [Looker v. Davis, 47 Mo. 145.]" The case of Looker v. Davis, above cited by GANTT, J., is an illuminating case.

The case of Miller v. Slupsky, 158 Mo. 643, was a suit by the heirs of Sophia Slupsky to have a resulting trust in a lot and house in St. Louis declared in their favor, on the ground that the defendant, Abraham Slupsky, used the money of his deceased wife, the said

Sophia, to buy the property, and wrongfully took the title in his own name. It was specifically held in that case that the defendant, his wife being dead and being the other party to "the cause of action," and "plaintiffs' cause of action being derivative" through her, was incompetent to "testify that the lot in question was bought and paid for by his own money"; but there was no holding that the plaintiffs were or were not competent. But they did testify and their testimony is set out in the opinion, and upon it this court, through BRACE, P. J., reversed the decree of the trial chancellor and remanded the cause with directions to enter up judgment for plaintiffs. If plaintiffs in that case were competent to testify, then so are plaintiffs in this case.

In Banking House v. Rood, 132 Mo. l. c. 261, it is said by MACFARLANE, J., "It will be observed that the *proviso* [of section 4652, the part we have above quoted], does not exclude the testimony of one party in interest when the other party in interest is dead, but confines the exclusion to a party to the contract or cause of action, while the body of the statute removes the disability of a person caused by his interest in the suit. The exclusion of the *proviso* is not as broad as the inclusion of the body of the act. Hence, an examination of the cases will show that 'a party to the contract' has been construed to mean the person who negotiated the contract, rather than the person in whose name and interest it was made."

Stam v. Smith, 183 Mo. 464, was a suit to set aside a deed alleged to have been made in fraud of creditors by a grantor who was dead at the trial. The court held that "the contract in issue and on trial" was whether the deed was made to hinder, delay and defraud the grantor's creditors, and that was an issue between the grantor and his creditors, and, therefore, the grantee in the deed was not incompetent to testify.

The three cases first cited, supra, are direct authority for holding that plaintiffs were competent to testify in this case. They run back through many years, and should not now be disturbed unless plainly erroneous. If the point were one of first impression in this court, we might hesitate to hold that the statute was not meant to make plaintiffs in a case like this competent to testify; but the letter of the statute does not make them incompetent, and that being so, and this court having for many years held them to be competent, we are constrained to hold in this case that they were competent.

IV.   We have settled the competency of plaintiffs to testify, because without their testimony the evidence scarcely measures up to that clear, cogent, positive and convincing character which the law requires for the establishing of a resulting trust where the transaction out of which it grew occurred many years (in this case over 22) before the trial.

Even with their testimony it is not wholly satisfactory in some respects, and is far from satisfactory as to the value of the land at the time it was deeded to defendant.

The evidence unquestionably shows that some cattle were used by defendant to pay for the land, but it does not show what their value was, nor clearly that they belonged to Mrs. Downing, and the chancellor therefore very properly excluded them from consideration in determining what plaintiffs' share in the land should be.

But there is no such infirmity in the evidence as to the four-year-old mare and the two-year-old colt. In addition to the testimony of all the plaintiffs that they belonged to their mother, Eldridge Rowe testified that he knew the colts from the time they were foaled, that they were colts of mares that belonged to Mrs. Byrn before her marriage to defendant, and that the colts were on her place at the time of her marriage

to defendant, which would make the younger one at least two years old when Downing traded them for the land, for the trade was made in November, 1883, and the marriage was in June, 1881. All the witnesses say the other horse was a four-year-old filly. John King who had worked for Mrs. Downing before her marriage and for Downing afterwards, says of the colts that "their ages were two and four," and "I expect they were worth—the two of them—$250." Oren Stingley testified that after this suit was brought he and defendant had a talk "about this case and we talked about the trade with Mr. Rogers," and that in the course of the conversation he said to defendant, "You let two colts and three cows go?" to which defendant replied, "No, I let the colts and one cow go." Robert McKee, the husband of one of the plaintiffs, and himself joined as a plaintiff for that reason, testified: "They were Mrs. Byrn's horses and cattle. I don't know who the yearlings belonged to. I didn't know whether they were his or hers." Six witnesses testified that these colts belonged to Mrs. Downing, and an equal number, if we include the implied admission of defendant to Stingley, testified that they were used by defendant in purchasing the land. The chancellor found the colts were worth $125, and the evidence clearly supports that valuation; in fact, it would support a higher valuation.

The evidence thus far to establish a resulting trust is satisfactory. But there is another feature of this case that should not be overlooked. The land was deeded to defendant almost twenty years prior to Mrs. Downing's death. She had the right, from the time she discovered that defendant had used her stock to pay for the land and taken the title in his name, to bring suit against him to have the title vested in her, yet she died without ever having brought such a suit. The evidence reveals that she and defendant and their families lived together on the 360-acre farm left by her

first husband, and defendant had sixty acres of land of his own. Perry Byrn, thirteen or fourteen years old when the trade was made, testified that he claimed the four-year-old mare, and that he and defendant had some trouble over his claim, and that he "went away and worked," and that in settlement of his claim and if he would come back and work, defendant gave him another horse. We are not satisfied that defendant did not reimburse Mrs. Downing for her stock he used in paying for this land. The burden of establishing that fact is on him, and he cannot testify. We think the evidence clearly shows that the colts once belonged to Mrs. Downing, but it also tends to show that she had given this mare to her son and permitted her son to receive the payment for her. If so her heirs have no right to claim the land bought with the mare. The evidence also fails to show any dispute or acrimony between her and defendant over the use he made of her stock. There is evidence that more than once she said to him or in his presence that he had used her stock to pay for the land, and that he made no reply to her assertions; but does it follow that he did not in some way compensate her? Would it not be more reasonable to suppose that a husband who lived, so far as this record shows, twenty years in peace with a wife, when he discovered she persisted in claiming he had wrongfully appropriated her property, took proper steps to repair the wrong, and that when she let nearly twenty years go by without suing him, he did in some way reimburse her? And is there not some intimation in the testimony of Perry Byrn that he did reimburse her? The statute makes the appropriation by a husband of his wife's property without her consent in writing a fraud, but it has not altogether dissolved the marital relation; it does not make them strangers, and destroy the many trustful confidences that should always exist between husband and wife. We all know that many little transactions between them in reference

to the use by him of her property do arise which when only one side is told look like a conversion by him to his own use of her property, but which if he could be permitted to explain them would appear to have been legally and amicably settled by them. The courts do not look favorably upon claims of many years' standing where all the facts might have been established by a timely suit. They are slow to disturb land titles which have existed for many years and where neither of the parties who were most concerned can testify, one being dead and the other's mouth being closed by that fact; and when those are the facts and the decree divesting the title is dependent upon oral testimony, detailing in many cases loose conversations which occurred years agone, they require the mind of the chancellor to be satisfied by clear and positive proof. This feature of the case may be clarified on a retrial, and hence we now do no more than point out its weakness in this respect.

The weakest point in the evidence is as to the value of the forty acres of land. The only witness who testified on the point was David Rogers who was a son of A. L. Rogers, the grantor of the land, and who testified that he was thirty years of age at the time the trade was made, living in the neighborhood, and that his father "always asked ten dollars an acre for the land, or $400." In addition to this it may be said that the petition alleges that defendant purchased the land "for the price and consideration of four hundred dollars," and then proceeds to state the volume and page of the record where the deed was recorded, and at the close of the evidence it was "admitted that defendant holds the legal title to the land referred to." If the deed was offered in evidence the abstract does not show it. The value of the land placed upon it by Rogers and Downing, when they came to trade, or, if that could not be shown, its value in the open market at the time the trade was made, was an essential element of plain-

tiff's case; and there was no substantial evidence whatever upon the point. That offered does not rise higher than mere conjecture. The fact that Rogers always asked ten dollars an acre, or $400, for the land, is not proof that its value was four hundred dollars. The owner of property may ask far more or far less than what it is worth in the market. We do not mean to say that the proof as to the value of the land should be of that clear, cogent, positive, convincing character necessary to establish the resulting trust itself; but we do mean to say that there must be some substantial evidence to support a finding on the point. It ought to have been an easy matter to show what was the value of this land in 1883, when Downing bought it, and that not having been done by any substantial evidence, the judgment should be reversed and the cause remanded. It is so ordered. All concur.