REED *et al.* v. PAINTER *et al.*, *Appellants*.

Division Two, July 6, 1898.

| 145 | 341 |
| 92a ³ | 32 |
| 92a ² | 33 |
| 145 | 341 |
| 95a ² | 344 |
| 100a ³ | 722 |

1. **Evidence**: COMPETENT WITNESS: HEIRS. Painter induced his wife to exchange her town lots for a farm, and fraudulently took the title in his own name. After the death of Painter, the children of the wife by a former marriage brought suit against his heirs to set aside this deed, and one of her daughters, a plaintiff, was permitted to testify. *Held*, that, as she was not a party to the original contract or exchange of the lands, she was not incompetent to testify, either at common law or under the statute.

2. **Married Women**: RIGHT OF WIFE TO SUE HUSBAND. While a married woman, by the General Statutes of 1865, was not entitled by herself to sue for possession of her lands (that right still remaining in her husband), yet when her husband fraudulently took to himself the title to land for which she had paid, an action in equity accrued to her during coverture to have the legal title restored to her.

3. ———: ———: DEATH OF WIFE: THREE-YEAR LIMITATION. After such action *accrues* to her, her heirs can bring suit to set aside the fraudulent deed to the husband within three years after her death, but not later than that. And this is the law, whether or not ten years have expired between the time the action accrued and her death.

4. ———: STATUTE OF LIMITATIONS: GENERAL STATUTE: TRUSTS. The statute of limitations in this State applies to all civil actions, to those which were formerly denominated suits in equity as well as to actions at law, to resulting as well as to implied and constructive trusts. But it does not run against direct trusts.

*Appeal from Cape Girardeau Court of Common Pleas.*—
HON. ALEX. ROSS, Judge.
REVERSED.

*Wilson Cramer* for appellants.

(1) By reason of the death of John Painter respondents, Martha Holcomb and Thomas Clark, were incompetent to testify, and the court erred in overruling appellants' objections to their evidence. (2) The evidence is not sufficient to establish a resulting trust. In the case of *Burdett v. May*, 100 Mo. 13, this court says: "The rule which prevails in this State, the general rule elsewhere upon the subject of resulting trusts, requires that in order to prove such a trust it must be established by testimony so clear, strong and unequivocal as to banish every reasonable doubt from the mind of the chancellor respecting the existence of such trust." (3) The cause of action set out in the petition, if it ever existed, accrued to Mrs. Caroline Painter, the mother of respondents. Having failed to sue within three years after her death, respondents, as her heirs, are barred by limitation. R. S. 1889, sec. 6769. (4) The only claim which respondents assert they derive from their mother, who died April 2, 1884. The present suit was not brought until September 5, 1893. Aside from the plea of the statute of limitations plaintiffs' laches should defeat them in this cause.

*R. G. Ranney* and *John A. Hope* for respondents.

(1) Where one party to the transaction out of which the cause of action arose is dead, the competency of the witness depends upon whether or not the witness was the other party to that transaction. *Angell v. Nester*, 64 Mo. 144; *Ring v. Jamison*, 66 Mo. 429. (2) The plaintiffs would have been competent to testify for themselves in a suit against Mr. Painter, although Mr. Painter could not have testified on account of the death of Mrs. Painter. *Looker v. Davis*, 47 Mo. 145; *Martin v. Jones*, 72 Mo. 24; *Poe v. Dominic*, 54 Mo. 124. (3) The real estate exchanged for the Dorman farm was acquired by ordinary deed and was not the wife's equitable separate estate. The common law in respect to the husband's possession of the wife's real estate, his absolute ownership of the rents and profits, and her incapacity to sue, was in force. Mrs. Painter died in 1884. She was not entitled to the possession of her real estate and no cause of action accrued to her. *Dyer v. Brannock*, 66 Mo. 420; *Dyer v. Witler*, 89 Mo. 86; *Smith v. Patterson*, 95 Mo. 529. (4) This suit, as well as ejectment, is a "real action" and is within the meaning of "action for the recovery of any lands, tenements, or hereditaments." R. S. 1889, sec. 6764. Equity follows the law. The statute applies to all civil actions, legal or equitable. *Kelley v. Hurt*, 74 Mo. 572; *Rogers v. Brown*, 61 Mo. 192. (5) The general rule (subsequently changed by statutes) was that the wife could not sue her husband except where her equitable separate estate was involved or where she was seeking a separate provision out of her general estate. 2 Kent Com. 164; 1 Dan. Ch. Pr. [2 Am. Ed.] 146; Stewart on Husband and Wife, secs. 210, 211 and 431; Schouler Dom. Rel. [2 Ed.], sec. 189. (6) "The rights of the *cestui que trust* can not be barred until

his rights fall into possession." 2 Perry on Trusts [3 Ed.], sec. 860. (7) No cause of action accrues until there is a person in existence capable of suing. *McDonald v. Walton*, 1 Mo. 727; *Murray v. E. I. Co.*, 5 Barn and Ald. 204; *Pendleton v. Andrews*, 70 Ga. 306. Cause of action implies not only right of action, but power of action. *Bremen v. Quick*, 88 Ind. 546; *Baker v. Borclift*, 76 Ala. 414; *Sorrels v. Trantham*, 48 Ark. 386; *Harris v. Ross*, 86 Mo. 89; *Arnold v. Bunnell*, 42 W. Va. 473; *Hines v. Johnson*, 95 Ga. 470.

GANTT, P. J.—On the twelfth day of April, 1890, plaintiffs brought suit against John Painter in the circuit court of Cape Girardeau county, alleging in the first count of their petition that he had converted to his own use the proceeds of an insurance policy on the life of their father, John H. Clark, for which they sought to make him account, and in the second count charged that he fraudulently took the deed to certain lands in his own name instead of in the name of his wife, and prayed that he might be declared a trustee for her heirs, the plaintiffs, and required to account for rents and profits. John Painter died pending that suit, July 25, 1891, and thereupon plaintiffs caused it to be revived against his administratrix, Sophia Painter, and proceeded against her alone. On the trial of that case in the circuit court, the court dismissed the second count because the heirs of John Painter were necessary parties, and it stated no cause of action against the administratrix. At the same time the circuit court on the first count found that all the heirs of John H. Clark were barred by limitation excepting his daughter, Mrs. Amelia T. Reed, who married before her father's death and was still under coverture, and for her the court gave judgment for $1,659.15. That judgment was reversed by this court at the April term, 1895. *Reed v.*

*Painter*, 129 Mo. 674. More than two years after the death of John Painter, to wit, on September 5, 1893, plaintiffs instituted this suit in the Cape Girardeau court of common pleas against the heirs of John Painter, pleading the same cause of action stated in their second count which was dismissed in the circuit court.

The substance of the petition is that plaintiffs are the heirs at law of Mrs. Caroline Painter; that at the time of her marriage to John Painter she was the owner in fee of a part of Lot No. 4 in Range "D" in the city of Cape Girardeau; that said lot was well worth $4,500; that said Painter fraudulently persuaded his wife to join him in a conveyance of said lot; that at that time one Archibald Dorman was the owner of a small farm in Cape Girardeau county near the city of Cape Girardeau, containing 87.37 acres; that said Painter by making fraudulent representations induced and persuaded said Caroline, his wife, and the mother of plaintiffs, to exchange her said lot for the said farm of the said Dorman, and instead of taking a deed from said Dorman to said Caroline, fraudulently took a deed from said Dorman to himself to said farm; that the only consideration for said farm was the deed from said Caroline and said Painter, conveying to said Dorman her said lot; that knowing it belonged to his wife, said Painter permitted her children by her former husband, Clark, to occupy it for awhile; that as an inducement to obtain her consent to said exchange, he represented to his said wife that it would be a great advantage to her to move on it while her sons were young and inexperienced; that subsequently these plaintiffs discovered the said deed from Dorman to said Painter, and he promised to have it corrected; that the rents and profits were $250 a year. To this petition the defendants who appeared, filed a separate answer and admitted they were heirs of John Painter, but denied all the other averments

in the petition. They also pleaded that if the cause of action existed as set out in the petition it accrued to Mrs. Caroline Painter, and was well known to her and she died in 1884 and plaintiffs, who are her heirs, failed to bring this suit within three years after her death, and they plead in bar the statute of limitations. They also pleaded laches in not commencing and prosecuting this suit until nine years and five months after the death of their mother, and two years after the death of said John Painter the ancestor of defendants. The cause was heard in September, 1894 and decided in January, 1895 by the common pleas court. The judge made a special finding of facts and rendered a decree for plaintiffs, from which defendants appeal.

The evidence is preserved in full. The conveyances show that Mrs. Clark received a warranty deed to the town lot on June 23, 1870. On the seventeenth of March, 1874, Archibald Dorman conveyed the farm referred to in the pleadings to John Painter for $4,500. On the twenty-third of March, 1874, Caroline Painter and John Painter, her husband, conveyed the town lot of Mrs. Painter to Dorman for $4,500. John Green, a negro man, testified for plaintiffs that he worked for Mr. Painter in 1873-4-5, doing general farm work. During that time he understood Mr. Painter to say he had traded the town lot for the Dorman farm, but he couldn't say what he said; that Mrs. Painter asked him if he didn't think it was a good thing for her boys. On one occasion he said he was not going to give the farm to the boys till he saw further, he didn't know how they were going to get along. He heard Mr. and Mrs. Painter talking when he was making the fire, but they were not directing their conversation to him. He understood them to say they had sold the town place and bought the farm, and thought it was a good exchange for their boys, to get them out of town. The

witness said that Mr. Painter didn't say a great deal about it. He didn't hear what he said. Lind, the butcher, said he and Dorman dealt with each other, and he undertook to tell what Dorman told him, that he traded his farm for the lot. All clearly hearsay.

Mr. Joyce owned a farm adjoining the Dorman farm and on one occasion he wanted a lane opened between the two places so that he could get out to the gravel road. He went to see Mr. Painter about it. Painter had no objection to the opening of the land. He said we could move his fence in two feet. Joyce told him it would be necessary to make some rails, as the fence was poor, but Mr. Painter remarked that he would not spend any money on the place; that the farm did not all belong to him. At least he conveyed the idea to Mr. Joyce. This conversation was in 1883 or 1886.

In addition to the foregoing, plaintiffs read the deposition of Mrs. Martha Holcomb, one of the plaintiffs, and a daughter of Mrs. Caroline Clark–Painter. To this deposition defendants objected, for the reason that she was incompetent to testify by reason of the death of John Painter. Objection overruled. "My mother died in May. My mother married the second time to John Painter in 1872, to the best of my knowledge and belief. I lived with my mother after she married John Painter about ten years. They were living at Cape Girardeau, Missouri. I am acquainted with the part of lot four, range D, of the city of Cape Girardeau, fronting on Main street, which formerly belonged to my mother. I know the place known as the Dorman farm, lying near and west of the city of Cape Girardeau. It belonged when I first knew of it, to Mr. Dorman, to the best of my knowledge and belief. A day or two before the exchange of property, lot four on Main street for the Dorman farm, I heard my mother and Mr. Painter discussing the matter. To the best of my recollection

it was not my mother's desire to make the exchange. Her objection was that the property rightfully belonged to her. Upon a promise from Mr. Painter that he would have the property deeded to my mother and that the boys should use it for their home, she consented to make the exchange. To the best of my knowledge and belief it was at least two years before my mother knew that the property in question was not deeded to her after the exchange was made. After my mother discovered that the property was not deeded to her, I have heard her ask him repeatedly to have the deed changed, and as often as she would ask he would promise to do so, alleging that he thought the property had been deeded to her in the transfer. After my mother's death, in parlor of house owned by Mr. Painter, where I made my home and before my marriage, I heard a conversation between Mr. Painter and Father Hickey with reference to changing the deed to her name, Father Hickey insisting that the change should be made. Mr. Painter answered by saying that, as long as I lived with him, I would be taken care of and receive all that belonged to me, and that he would be willing to deed the property to me, but objected on the ground that it would give the rest of my mother's children a strong claim on him, and toward whom he always expressed a strong antipathy. The above conversation took place in the month of June, 1884. Was first advised as to my legal right to said property about five years ago.''

Thomas Clark, a son of Mrs. Painter, testified, over the same objection as to competency, that his mother owned the city lot; that in his presence Mr. Painter urged his mother to make the transfer for the Dorman farm, and about two weeks later Mr. Painter told him he had effected the transfer. He first learned the deed was made to Mr. Painter in 1882 or 1883. He

was further interrogated and answered as follows: "*Q.* If you ever heard Mr. Painter say anything in regard to the ownership of this farm, known as the Dorman farm, state what he said since the trade was made? *A.* The first time he made a statement of this farm belonging to my mother was at the time my mother had left him, and come to us out there on the farm. We were then living on this Finch farm and mother had left and come out there, and Mr. Painter came out there horseback to see my mother. We could look through the east window and see Mr. Painter—well, I guess a quarter of a mile before he got to the house. My mother first discovered him coming, and she told me to meet him at the gate, and if he wanted to see her, that he must come back to town and get some of her friends to come with him. He came back to town and brought Dr. Wilson out with him that same day. That is the first time I heard him make this statement that the farm belonged to her and her children.

"*Q.* Do you know of any other statement that he made concerning the ownership of the property? *A.* Once after that down here at the corner of Mr. Albert's, about the time or just before he sent the priest after mother. She had then gone to Iowa to my sister Amelia's, and he said if we would urge her or persuade her to come back to him, he would return all that belonged to us. That is all he told me.

"*Q.* He was speaking then of this Dorman farm? *A.* Yes, sir.

"*Q.* What property was Mr. Painter speaking of when he said he would return to her all that belonged? *A.* At the time down here at the corner he didn't mention any particular property.

"*Q.* Did your mother come back after that? *A.* Yes, sir."

*Cross-Examination.*

"*Q.* Now, who was present at the time you told him that your mother said if he wanted to see her he must come to town and get some of her friends? *A.* My two sisters.

"*Q.* Any one else? *A.* No one else.

"*Q.* And you told him that? *A.* Yes, sir.

"*Q.* And then he came to town and got Dr. Wilson? *A.* Yes, sir.

"*Q.* Did you meet him at the gate the first time? *A.* At the gate, yes, sir.

"*Q.* How long did he remain there? *A.* Fifteen minutes, maybe longer; anyhow fifteen minutes.

"*Q.* Now, what was it he said then? *A.* That he came to see my mother.

"*Q.* When he came back what did he say? *A.* He said that if mother would come back to him he would return what belonged to her and her children.

"*Q.* Meaning the Finch farm? *A.* Yes, sir.

"*Q.* If she would come to him he would return what belonged to her; is your memory clear on that point? *A.* Yes, sir; it is.

"*Q.* Who was present at that conversation? *A.* My two sisters, my sister-in-law, my brother and myself and Dr. Wilson.

"*Q.* Where is Dr. Wilson now? *A.* Here in town, I suppose.

"*Q.* Living here? *A.* Yes, sir.

"*Q.* Was it your sister, now Mrs. Holcomb, who was present? *A.* She was one of them.

"*Q.* And Mrs. Reed? *A.* She was one of them.

"*Q.* Your brother is dead since that time? *A.* Yes, sir.

"*Q.* Where did that conversation take place? *A.* Right in the room.

"*Q.* What year was that? *A.* I don't remember the year exactly, Mr. Cramer; I'm no hand at remembering dates. I could tell from a memorandum I have.

"*Q.* How long before your mother's death? *A.* Oh, some time; several years.

"*Q.* Several years before her death? *A.* Yes, sir.

"*Q.* Did you visit Mr. Painter after your mother and he went together again? *A.* Not Mr. Painter, no, sir.

"*Q.* Did you visit at his house? *A.* Yes, sir; I did.

"*Q.* Did you have any conversation with him? *A.* Not with him; no, sir.

"*Q.* Well, how frequently did you visit there after your mother went to live with him again? *A.* Once a week, I guess, on an average.

"*Q.* And you had no conversation with him? *A.* No, sir.

"*Q.* And still you say you were not unfriendly? *A.* I said when I met him at the gate that time, we were not unfriendly.

"*Q.* After that you were unfriendly? *A.* Yes, sir; we were.

"*Q.* When was it, Mr. Clark, that you met Mr. Painter at Albert's corner, and had that conversation with him? *A.* During the time my mother was at our house out there, just before she went to Iowa to my sister's.

"*Q.* Can you fix that date, the year she went to Iowa? *A.* No, sir; I can't from memory, not the year. It was about—well, I can't come anyways near it, I don't believe. It was in '86 or '87, it seems to me.

"*Q.* Your mother died in 1884, didn't she? *A.* Oh, yes, sir; I mean in 1874.

"*Q.* Well, now, what was said in that conversation? *A.* What conversation?

"*Q.* At Albert's corner? *A.* He called me as I was crossing the street and told me that, if mother would come back to him, he would return or make good to us all the property due us. That is the substance of what he said.

"*Q.* At that time you were still on friendly terms? *A.* Yes, sir.

"*Q.* And you say Mr. Painter sent the priest to Iowa to get your mother to come back? *A.* Yes, sir.

"*Q.* How long were they separated before she came back? *A.* Well, it was several months, I think; not a year.

"*Q.* And the only time you heard Mr. Painter say anything at all about this matter was during the time he and your mother were apart, and he was making efforts to get her to return? *A.* At the time that the trade was made, or the transfer, as you call it, he remarked that the farm would be a good place for us boys; it would be a home for us.

"*Q.* Is there anything else you remember that he said; anything about the ownership of the farm? *A.* No, sir; not at that time.

"*Q.* Excepting the statement you say he made at the time the trade was made, the only other conversation which you heard occurred during the time he and your mother were separated and he was trying to get her to come back? *A.* Yes, sir.

"*Q.* You did not know anything about the terms of the trade? *A.* I heard him talking about it. I was sitting in the room, my sister, Martha, and myself."

Defendants identified the bill of exceptions in first suit; offered a portion of John Green's evidence as to the date where he commenced to work for Mr. Painter. A certified copy of petition in the first suit, showing it

was the same cause of action; certain admissions as to the death of Mr. Painter, the pendency of suit at the time, and commencement of present action.

1. The objection to the competency of Mrs. Holcomb was properly overruled. She was not a party to the original cause of action and the statute in no way affects her right to testify. She was competent at common law and since the statute. *Looker v. Davis*, 47 Mo. 145.

II. The important and controlling question for decision is that of limitation. Article I of the chapter on Limitations of Actions treats of real actions, and provides that "no action for the recovery of any lands or for the recovery of *the possession* thereof shall be commenced, had or maintained unless the plaintiff, his ancestor, predecessor, grantor or other person under whom he claims was seized or possessed of the premises in question within ten years before the commencement of such action." R. S. 1889, sec. 6764. Section 6767 provides that "if any person entitled to commence any action under said article be at the time such right or title shall first descend or accrue either within the age of twenty-one years, or insane . . . . . . . . or a married woman, the time during which such disability shall continue shall not be deemed any portion of the time in this article limited, but such person may bring such action after the time so limited and within three years after such disability is removed." Section 6769 provides that "if any person entitled to commence such action, (i. e., action to recover real estate or possession thereof) *die* during the continuance of any disability specified in section 6767 and no determination or judgment be had of the title, right or action to him *accrued*, his heirs, or any person claiming from, by or under him, may commence such action after the time in this article

limited for that purpose and within three years after his death but not after that period." The facts established by plaintiffs' evidence are that Archibald Dorman conveyed the farm they claim to John Painter, March 17, 1874. Mrs. Holcomb testifies that about two years later Mrs. Painter learned that her husband had wrongfully taken the deed to himself in fraud of her rights. The real estate which Mrs. Painter exchanged for the Dorman farm was not held by her as her equitable separate estate. Having intermarried with Mr. Painter, on the tenth day of September, 1871, his common law marital right to the possession of the land, the exclusive possession, accrued to him during their marriage as against his wife. *Bledsoe v. Simms*, 53 Mo. 305; *Dyer v. Wittler*, 89 Mo. 81. But when John Painter took the deed to the Dorman farm for which his wife had paid the purchase money, without her consent, he was guilty of a constructive if not actual fraud, and a resulting trust was created in her favor. Mrs. Painter having learned of this breach of trust demanded a conveyance of the title to herself. While admitting her right he put her off from time to time, and she died without ever having recovered the legal title. While a married woman under the fourteenth section of the Married Woman's Act found in the General Statutes of 1865, was not entitled to sue by herself for possession of her lands, that right still remaining in the husband, she had during coverture a right of action for an injury done to her inheritance or the integrity of her fee simple title to her lands just as any other person, and when as in this case the very title itself had been wrongfully taken from her by the fraudulent act of her husband an action in equity accrued to her to have the legal title which was in her husband divested and to have the same restored to herself. Mrs. Painter having died during her coverture

and no determination or judgment having been had of the right of action which accrued to her, her heirs were authorized to commence this action which had descended to them from their mother, *within three years after her death*, but not after that period. R. S. 1889, sec. 6769. Mrs. Painter died April 2, 1884. On April 3, 1887, the right of her heirs to sue expired. It is argued by plaintiffs that the wife could not have sued her husband, to subvert his unwarranted action in taking a deed to her property; that she could only sue where her equitable separate estate was involved, or she was seeking a separate provision out of her general estate. This is most clearly erroneous. Long before, our statute of 1868 permitted her to sue her husband and appear by her attorney. R. S. 1879, sec. 3468. Such a suit as this was maintainable in equity. Story's Eq. Pl., sec. 61; *Walter v. Walter*, 48 Mo. 140.

As to the proposition that the improper conduct of John Painter arrested the operation of the statute, we do not think there is any evidence whatever which would justify the application of that doctrine. Plaintiffs themselves testify that on all occasions after 1876, he admitted his wife's right. He remained in the county until her death and up to the time of the commencement of this suit. It thus appears that John Painter had been in possession of the land for nearly ten years under his deed from Dorman and during eight years of that time Mrs. Painter knew the deed was to him instead of herself. She died while yet under coverture in 1884. Her heirs did not bring this suit within three years after her death and by the express terms of the statute they are barred, unless the suit is one which can not be barred by the statute. R. S. 1889, sec. 6769; *Gray v. Yates*, 67 Mo. 601; *Wheelock v. Overshiner*, 110 Mo. 100; *Hinters v. Hinters*, 114 Mo. 30.

It is urged that the statute of limitations did not operate on this resulting trust. The general rule in this State is that the statute applies to all civil actions, to those which were formerly denominated suits in equity as well as to actions at law. *Kelly v. Hurt*, 61 Mo. 463. And it is also the prevailing doctrine that the statute is a bar also in cases of implied and constructive trusts. *Landis v. Saxton*, 105 Mo. 489. The trust resulting in favor of Mrs. Painter by the appropriation of her lot to purchase the land in suit is an implied trust not a direct trust against which the statute does not run. Having full knowledge of all the facts prior to their mother's death, plaintiffs have neglected to bring their action within the time prescribed by the statute and however meritorious their action may otherwise appear, it is barred by the statute.

The judgment of the common pleas court is reversed. SHERWOOD and BURGESS, JJ., concur.