CATHERINE KOYL, et al., Appellants v. HENRY P. LAY, Adm'r, at al., Respondents.

Kansas City Court of Appeals, May 22, 1916.

1. **GUARDIAN: Pension: Trust: Limitations.** A soldier in the Civil War was killed in 1863. He left a widow and three daughters of tender years. In 1865, his widow married his brother and they had five children. The U. S. government gave the three daughters a pension and their step-father, who became their guardian, drew what was in arrear and afterwards, quarterly. He invested it in part payment of a farm where he raised his step-children and his own and lived over forty years. On final settlement, as guardian, there was a balance due each and they each being of age, acknowledged satisfaction, but really received nothing. It was *held* that a trust relationship existed whereby each of the three wards had a claim on the land for so much of their money as was used in purchasing it. It was further *held* that on final settlement the balance due the wards, though receipted, was a debt payable to each ward and that the Statute of Limitations begun to run in favor of the guardian from the day of the settlement. It was further *held*, that even though there was a trust in their favor against the land after the settlement and balances found, yet it was a resulting or implied trust, against which the Statute of Limitations ran from the day it was ascertained.

2. ———: Statute of Limitations: Final Settlement. The Statute of Limitations will begin to run in favor of a guardian from the day of his final settlement after his wards became of age.

3. TRUSTS: Implied: Resulting: Express: Limitations. The Statute of Limitations runs against implied and resulting trusts, but not against an express trust which, if in land, must be evidenced by writing.

4. ———: Express Trust: Personalty: Sale of Land: Writing. While an express trust in personalty may be created by parol, yet if the trust- is sought to be enforced against money because realized on a sale of land against which the trust is charged to have existed, it must be evidenced by a writing.

5. ———: Constructive Trust: Limitations. A trust does not arise out of a mere contract of indebtedness between debtor and creditor. And if the breach of such contract is such that a trust may arise, it is a constructive trust against which limitations will run.

Appeal from Benton Circuit Court. *Hon. C. A. Calvird,* Judge.

AFFIRMED IN PART. REVERSED AND REMANDED IN PART.

*W. S. Jackson* and *Mark A. McGruder* for appellants.

*H. P. Lay* and *Chas E. Yeater* for respondents.

ELLISON, P. J.—This is a bill in equity which may be said in a general way to have for its purpose an accounting by the estate of a guardian to the plaintiffs as wards of the deceased guardian. The trial court dismissed the bill.

John A. Meier was a soldier in the Civil War and died in 1863, during that war, leaving a widow and three infant daughters. Two of the daughters are the plaintiffs in this action and the third, Christina Armstrong, refusing to be a plaintiff, was made a party defendant. Heinrich Meier was a brother of John and married his widow in 1865 and they had five children who are defendants herein. Heinrich died in 1913, and defendant Lay is his administrator. His wife had died shortly before.

These plaintiffs and their sister Mrs. Armstrong, as infant children of their deceased soldier father, became entitled to a pension from the United States government. Heinrich Meier, being their stepfather by his marriage to their mother, was appointed their guardian and curator and as such, in 1868, received the first payment of an accumulated pension, amounting to $675. He continued to receive the quarterly instalments of their pension until it ceased as they became of age. In a few weeks after Meier received the first payment of the pension he bought a farm of one hundred and twenty acres, for $720, upon which he moved, and there he lived, with his wife, and raised his step-children and his own. In 1911, after having lived on this farm for near forty-five years, he sold it for $9220.

Meier, as guardian for his step-children (these plaintiffs and Mrs. Armstrong), did not make a settlement with the probate court of Benton county for three years from his first receipt of the pension money, when in April, 1871, he filed his first settlement which showed a balance due the children of $1012.10. There is not a clear distinction between the years of other settlements, but it may fairly be said that he made annual settlements to the year 1877, when he made a final settlement of Mrs. Armstrong's interest, who had become eighteen years of age, showing a balance due her of $486.92. In 1880 he made a joint final settlement of the interests of the two plaintiffs, who also had become eighteen years of age, showing a balance due each of $996.92. Each of the wards acknowledged and receipted payment of the separate balances found to be due them and Meier was discharged as guardian.

It is the theory of plaintiffs that the guardian was a poor man living on a rented farm when he received their first pension money of $675. That he bought the farm on which they were raised, paying $720 for it by paying out of their money the cash payment of $420, and giving his note for $300 with a deed of trust on the place to secure it. That he afterwards gave two other deeds of trust on the land, paying all of them off with their money. That the three children lived with their

mother and step-father guardian until they were each married, when they went to homes of their own. That from the time they were old enough, they did all kinds of farm labor including plowing and harvesting, and that at times they worked as domestics in the city of Sedalia, turning in their wages to their parents. In the settlements we have spoken of above the guardian, while charging himself liberally with interest, makes no mention of any loans to other persons, and we can draw no other inference than that he kept and used the pension money as his own, thinking, of course, that rendering an account with interest would be all that was necessary.

The settlements show moderate charges for all items with which he has credited himself, some seemingly nominal. For the first three years, the children being small, there is an aggregate charge of $39.25 for clothing, and $8.60 for German schooling; and $75 for "caring for children." There is a charge for schooling and clothing in each of his settlements that seem reasonable enough; and in his second settlement there is a lump charge for $300 for board for seven years which is but little more than $14 per year each. Again, in succeeding settlements, the board charged is $2 per month each.

But we do not altogether agree with counsel that the guardian is entitled to praise for his liberality to the children as evidenced by his moderate charges and his liberal allowance of interest on the money in his hands. The impression which the record leaves of that household is, that idleness was not one of the faults of these children. They lived plainly and worked hard and at no place in any of the settlements are they credited with labor. Now it would reasonably seem that in the number of years they lived at home, three-fourths of the time when they were of self sustaining age, their labor should have, at least, equalled their board and clothes.

We think the evidence sufficiently clear that Meier used the pension money of his wards in part payment for the land and improvements. He seems to have had nothing save a team, some cows, and other personalty of small value. He paid $420 in cash on the purchase, when he had $675 of their money, but he built a small

house and also put up a barn, which, with other neces-
sary improvements, must have exhausted the remainder
of that sum.  Doubtless the fruit of his own industry
contributed materially to the purchase.  He was receiv-
ing their pension money quarterly, and while the settle-
ments do not show that these sums were in uniform
amounts, they all exceeded $150 per annum.  Further-
more, there was affirmative testimony to the effect that
he at various times admitted that the children's money
went into the farm.  Besides this, there is the conceded
fact that after he sold the farm, he paid to plaintiff
Anna (who married Palmer) out of the proceeds the
sum of $800.  The evidence in plaintiff's behalf was that
this was a part payment of what was owing to her on
the final settlement.  Defendants account for it in a very
unsatisfactory way.  They insist that Anna asked him
for it to help her and her husband pay some debts and
that he, being feeble in mind and body, allowed himself
to be persuaded.  We feel satisfied from the evidence
that he considered himself indebted to her on account of
the guardianship and made a part payment of the bal-
ance found in his hands on the final settlement.

Defendant Christina Armstrong and plaintiff Anna
were offered as witesses (over defendant's objection) in
support of the petition.  Plaintiffs, while admitting that,
since the guardian was dead, neither could be a witness
in her own favor, the testimony of each could be received
in favor of the other.  They were heard by the court
subject to objection at the close of the case.  We have
had a learned discussion of the question.  We have con-
sidered their testimony and since we find that it does not
affect or control the conclusion we have come to, it will
be unnecessary to say whether they should have been
permitted to testify; for conceding their testimony to be
legal evidence, it does not alter the legal situation of the
parties.

The respective counsel have likewise furnished us
interesting arguments on the question of trustee rela-
tionship and of the doctrine of implied, resulting and
express trusts.  There is no material difference between
them as to the law of such relationship.  Counsel for

plaintiffs have made it plain that money of a ward invested by the guardian in lands the title to which he takes in his own name, and afterwards sells, may be followed into the sale money received, at the suit of the former ward. Defendant's counsel concede that it can. The point of difference between them relates to the question of laches and the Statute of Limitations with its arbitrary and specific period within which actions must be brought.

Preliminary to stating our conclusions on that subject, we may make our views clearer by observing that we think that while a trust resulted to plaintiffs for the amount of their money which the guardian used in part payment for the farm, and while the land might have been subjected to a lien in their favor, yet when that money was regularly accounted for in the guardian's settlements and final balances stated in the final settlement, approved by the probate court and accepted by the wards after becoming of age, such balances became a separate indebtedness from the guardian to each of his former wards for which he and the sureties on his bond would be liable. We need not say that in case of insolvency, an action in equity might not also be maintained enforcing a lien against the land for the balances. For if that be true, the fact remains that on a settlement in the probate court an ascertained and definite indebtedness was found in favor of each of the wards against the guardian, which was recognized by them, and we have no doubt the Statute of Limitations began to run as to each separately, when the settlement was made and the guardian discharged. [State ex rel. v. Hoshaw, 86 Mo. 193; State to use v. Willi, 46 Mo. 236; Johnson v. Smith, 27 Mo. 591.]

But, if we concede that a trust existed after the final settlement, which, as we have intimated, might be enforced against the land, it was not the continuing trust of guardianship; it was a resulting trust by force of the law; and it was a matured claim for the purpose of applying the Statute of Limitations, when the amount was finally and fully ascertained as each of the wards became of age. [Burdett v. May, 100 Mo. 13,

18; Reed v. Painter, 145 Mo. 341, 356; Hudson v. Cahoon, 193 Mo. 562; Johnson v. Ry. Co., 243 Mo. 278, 296, 297; Graham v. Wilson, 168 Mo. App. 193.]

While plaintiffs, in the opening paragraph of the brief, assert that the trust in this case arose by operation of law, yet throughout the argument, there is every indication of an endeavor to treat the case as if it were an express trust against which limitations do not run. [2 Perry on Trusts, Sec. 863.] Of course this must be under the view that the trust is not claimed against the land, for an express trust as to land is void if not in writing. [Sec. 2868, R. S. 1909.] If it cannot be claimed against the land, it should fail against the sale money realized on the land, for it is only through the land that the sale money may be followed.

Plaintiffs are therefore driven to a position of seeking to create a trust in money by reason of the guardian making a contract with each of them whereby he promised that he would pay each of them a certain sum in the future. But that amounts to a mere promise which ought not to be connected with an express continuing trust. In Soar v. Ashwell, 2 Q. B. Div. (1893) 390, 393, it is said that: "If the only relation which it is proved the defendant or person charged bears to the matter is a contractual relation, he is not in the view of equity a trustee at all, but only a contractor; and equity leaves the contractual relation to be determined by the common or statute law." In referring to a violation of such promise, the court in that case continued with these remarks, which, we think, are especially applicable to this case, both as to the question of trust and of the Statute of Limitations, viz.: "If the breach of the legal relation relied on, whether such breach be by way of tort or contract, makes, in the view of a court of equity, the defendant a trustee for the plaintiff, the court of equity treats the defendant as a trustee become so by construction, and the trust is called a constructive trust; and against the breach which by construction creates the trust the court of equity allows Statutes of Limitation to be vouched."

Much comment is made by plaintiffs concerning what was said by the guardian, and plaintiff's mother to them on the day they started into town to make final settlement, to the effect that if they insisted on their money being paid to them, it would take their home from them. So far as concerns the application of the Statute of Limitations, this strongly favors the defendants. It could only mean an acknowledgement that balances would be found due them by the court, and if plaintiffs insisted on payment, it would make necessary to part with the home. Conceding that plaintiffs were induced by this appeal to them to acknowledge receipt of the balances, without receiving anything, it only shows that they knew of the money due them and each volunteered that she would not demand payment. But, from a legal standpoint, we think they could not make a verbal promise which would reach beyond the period of limitations.

We therefore conclude that whether the evidence puts an end to the trust at the time of the final settlement, or whether that trust continued, in either event the Statute of Limitations bars the action, except as to the separate sum found due to plaintiff Anna Palmer to whom the payment of $800 was made, reducing the original amount of $996.92 due her on the settlement to $196.92. That payment having the effect of renewing the life of the claim as to that balance.

While there is neither sentiment nor equity in a statute fixing an arbitrary period beyond which a right cannot be asserted, yet it assumes the phase of benevolence in this case. These parties have been of age and final settlements have been made by their guardian for more than thirty-five years. At any time during this period they could have taken written acknowledgment of indebtedness for what they say is due them, or they could have brought suits for such sums. The testimony of two of them shows them to be intelligent married women with families, yet they have stood by until everyone, but themselves, who would be supposed to know of the matters involved have died. The Probate Judge and Clerk, may have known much, they

were not witnesses and are said to be dead. The farm was sold without objection from them and without an effort to secure the proceeds for more than three years. The mother died and finally the step-father and guardian. That about closed out the witnesses who were in position to know and who may have had much to say, if an opportunity had been presented in their lifetime.

We have been saved much labor in the case by the able, clear and thorough manner in which counsel for each party have presented it. The judgment will be reversed and the cause remanded with directions to enter judgment for defendants, except as to plaintiff Anna Palmer. A judgment will be entered in her favor for $196.92 with 6 per cent interest from the 4th day of November, 1911, the date of demand and the payment made on her claim. All concur.

## ON MOTION FOR REHEARING.

PER CURIAM.—The only point made on the motion for rehearing which we care to notice is that in reference to the time we have. named for the beginning of interest on the balance found to be due plaintiff Anna. Plaintiff suggests that the sums found to be due the wards on final settlement in the probate court, were judgments, or orders, of that court and that by force of the statute, all judgments or orders of courts bear six per cent interest. [Sec. 7181, R. S. 1909.] But besides satisfying those orders or judgments, plaintiff's petition refuses to recognize them; and the settlements of their guardian are treated in the same way.

Their petition is based on the theory that Meier, their guardian, bought the land and made the improvements thereon with. their money, and that after a long time he sold it. They claim they should be allowed their money and interest out of the proceeds of the sale.

They do not seek to recover anything on the ground of a final settlement and judgment, or order, of the probate court. On the contrary, as just stated, they repudiate such order and ask that it be set aside.

The petition alleges that the payment made to Anna was made, not on the final settlement judgment or order of the probate court, but a payment on her share of the sale money. The petition is based alone upon the right of plaintiffs to the sale money of the land.

We find that, in point of fact, the money belonging to plaintiffs was accounted for by Meier in his various settlements with the probate court and that the final orders finding the respective sums as final balances due these plaintiffs, were satisfied on the record and Meier discharged from his guardianship. No fraud was shown concerning these satisfactions thus entered on these judgments, nor is any suggested save that to sustain them would, in effect, be a fraud. Plaintiffs never after pretended to have any claim against Meier based on the judgment, or orders of the probate court and no demand was ever made of him until Anna was paid the $800.

We think it would be unjust and inequitable to allow plaintiff Anna interest prior to that demand. The motion should be overruled.