C. J. Zeitinger et. al., Appellants, v. Annuity Realty Company et al.—28 S. W. (2d) 1030.

Division One, June 3, 1930.

*Hall & Dame* for appellants.

*Bryan, Williams, Cave & McPheeters* for respondents Annuity Realty Company, St. Louis Union Trust Company, St. Louis·Union Trust Company, Trustee, and John D. Filley.

*Wilfley, Williams, McIntyre & Nelson* for respondents Railway Exchange Building, Inc., and Claude B. Ricketts.

*Nathan Frank, Louis B. Sher* and *Rassieur & Goodwin* for respondent May Department Stores Company.

RAGLAND, J.—This is an appeal from a judgment rendered on demurrer to the petition. The petition is quite long, covering thirty-six pages of the abstract; we will endeavor to set forth its substance in briefer space.

The Hargadine-McKittrick Dry Goods Company (hereinafter called the Dry Goods Company) is a corporation chartered "to carry on and conduct a general dry goods business." The plaintiffs are stockholders and bring this suit for the benefit of the corporation and of all other stockholders who are similarly situated and wish to join herein. The defendants are the officers and directors of said company and persons and corporations alleged to have knowingly benefited through an unlawful diversion of its funds as charged in the petition. The suit was commenced on the 27th day of December, 1924.

During the period from July, 1905, to November, 1911, Thomas H. McKittrick, the president of the Dry Goods Company, and

his associates, the directors, wrongfully and without authority took and diverted from its treasury an aggregate sum of $2,739,000 and used the same in the purchase, acquisition, preservation and maintenance of leaseholds, under leases for terms of ninety-nine years, in the parcels of ground which together comprise City Block No. 128 in the city of St. Louis, known as the Barr Block. Such leases were taken by said Thomas H. McKittrick in the names severally of six "dummy" real estate corporations in which he owned all the stock. In the acquisition and maintenance of the several leaseholds said Thomas H. McKittrick and Hugh McKittrick, the vice-president of the Dry Goods Company, incurred large personal obligations as guarantors and as sureties of the said dummy corporations.

On May 4, 1911, Thomas H. McKittrick by his written obligation agreed to repay the Dry Goods Company all moneys that' he had taken from its treasury and used in acquiring, preserving and maintaining the leaseholds just mentioned. At this point in the narrative the petition alleges: "That by reason of said transactions of the said McKittrick and the said dummy corporations so acquiring the leaseholds to said Block 128, the said property was charged in law with a resulting trust in favor of the Hargadine-McKittrick Dry Goods Company."

On November 15, 1911, an agreement was entered into between Jones and Filley, designated as Syndicate Managers, the St. Louis Union Trust Company, as trustee, and the annuity subscribers and the bond subscribers, setting forth the terms proposed by them for the financing of a seventeen-story building to cost $3,600,000. A few days later, on November 22nd, by supplemental agreement, the same parties arranged to finance the erection of a twenty-two-story building (in lieu of the seventeen-story structure) at a cost of $4,250,000. And two days later, November 24th, the syndicate managers contracted with McKittrick and the Hargadine-McKittrick Dry Goods Company for the taking over of the leases and the erection of such building under the terms of the November 15th and November 22nd agreements. These three agreements provided:

(a) The Syndicate Managers were to acquire from McKittrick and the Dry Goods Company the several leases on the property then held by the dummy companies, their claims for advances to said companies, their stock in said companies and the plans and specifications which had been prepared for the erection of such building.

(b) The Syndicate Managers were to transfer these leases and assets to a company to be formed by them, called Annuity Realty Company, which in turn should sublease the premises to a company to be formed by them and referred to as Building Company.

(c) The twenty-one story building was to cost $4,250,000, which money the Syndicate Managers had arranged to procure upon the following securities:

Annuity Company was to issue $3,000,000 of Annuity Certificates and to sell presently $2,725,000 thereof at 90. Building Company was to issue Building Company bonds to be secured by mortgage to the amount of $2,000,000 to be sold at 75, and McKittrick and the Dry Goods Company agreed to put in $300,000 more for which they were to receive Building Company's stock. The Annuity Company's stock was to be issued to and held by representatives of the Trust Company. The beneficial ownership was vested in the Annuity Certificate holders who, out of income, were to receive annually an amount equal to five per cent of the face amount of their certificates. Bonds of the Building Company were to be secured by a mortgage on their sublease, on the building and on their redemption right hereinafter referred to.

The lease from the Annuity Company to the Building Company was for a ninety-nine-year term, which was also the term of the original leases acquired by McKittrick. The Building Company was to pay as rent an amount sufficiently in excess of ground rents to provide for annual interest on the Annuity Certificates and for the ultimate redemption of the Annuity Certificates within the period of the first forty years. They were also redeemable at any time by the Building Company.

Whenever all Annuity Certificates were redeemed, Annuity Company's interest in the property was to be conveyed to the Building Company. Whenever the bonds issued by Building Company were also paid off and redeemed, Building Company would own the leaseholds and building free and clear.

The capital stock of the Building Company was $2,000,000. Three hundred thousand dollars thereof was issued for the $300,000 additional money which McKittrick and the Dry Goods Company were required to advance. The remaining $1,700,000 was issued to Dry Goods Company, because its money had been used by McKittrick in the acquisition and preservation of the leaseholds, through advances to his so-called dummy companies. The agreement also provided that the voting control of these shares should be placed in the Trust Company for forty years, to manage during the period required for the ultimate redemption of the Annuity Certificates.

At this point the petition specifically alleges: ''Said contract of November 24, 1911, was and is null and void, because it was fraudulent, in that T. H. McKittrick, Hugh McKittrick and every member of the McKittrick board were under personal obligations which were sought to be discharged by said contract, and therefore they were each and all of them disqualified to act for the corporation, the Hargadine-McKittrick Dry Goods Company, either in the authorization, execution or ratification of said contract.''

On April 1, 1912, and pursuant to said agreement of November 24, 1911, the Annuity Company and the Building Company (called Railway Exchange Building Company) were organized. The original leases and the claims of Dry Goods Company against the dummy companies and the shares in the dummy companies were assigned to Annuity Company, the property was subleased for a like term by Annuity Company to Building Company and the Railway Exchange Building was then erected and thereafter operated by Building Company as had been provided. In an agreement of April 2, 1912, it was provided that the rents under the Building Company's lease should be paid direct to the St. Louis Union Trust Company as trustee and the Trust Company was to make distribution to the Annuity certificate holders and arrange for the redemption of Annuity certificates when the "sinking fund" moneys were paid by the lessee.

In 1924 the Railway Exchange Building Company was declared bankrupt; the lease hereinbefore referred to was forfeited by decree of the United States District Court, and all assets of the Building Company (which included the right of redemption above-referred to) were sold on order of the referee in bankruptcy. The Building Company's assets were purchased by a representative of the bondholder's committee for the benefit of a new company called the Railway Exchange Building, Inc. This company had been formed for and by representatives of the old building company's bondholders. It received a new lease from the Annuity Company and thereupon borrowed $300,000 from the May Department Stores Company, executed a new sublease to the latter company and issued bonds to the amount of $1,875,000 to the old bondholders in exchange for their old Railway Exchange Building Company bonds.

All of the defendants, including the holders of Annuity Certificates, bondholders and the purchaser at the sale in bankruptcy, acquired their several interests in the leaseholds in the Barr Block with full knowledge of the Dry Goods Company's equitable lien thereon.

The petition concludes:

"Plaintiffs allege that by reason of the premises the said Hargadine-McKittrick Dry Goods Company and its stockholders had and now have an equitable lien upon said city block 128, and all the improvements thereon, to the extent of all of their moneys so wrongfully and unlawfully misappropriated and diverted to the purchase and acquisition and maintenance of said leasehold estates in said block, and that such equitable lien was and is prior to the rights and liens of all persons acquiring interest in said block with knowledge or notice of the right of said Hargadine-McKittrick Dry Goods Company and its said shareholders. . . .

"Plaintiffs further allege that by the said contract writing of April 2, 1912, the said Jones and Filley, as Syndicate Managers of the Railway Exchange Building Syndicate, first parties, St. Louis Union Trust Company, as trustee, second party, Annuity Realty Company, third party, Orr, Chase and Ryan being all of the stock-holders of the Annuity Company, fourth parties, and 'all of those persons or corporations who shall severally become the owners or holders of the ''Annuity certificates'' hereinafter described,' fifth parties, stipulated and contracted that whenever all the annuity certificates have been retired in any manner (whether by redemption at 110 per cent under privilege provided to run during their life, or by voluntary purchase, or by accumulations of the sinking fund included in rentals under the terms of the sublease of April 1, 1912), the Annuity Realty Company was to deliver to the Railway Exchange Building Company an assignment of all the leasehold estates, constituting the entire block No. 128, so as to merge said leasehold estates with the sublease held by the said Building Company, and to make the latter the owner of said leasehold estates, and thereupon the Annuity Realty Company was to be dissolved and liquidated; and that at the end of the forty-year period of the certificates, the trustee was to distribute to the then certificate holders, ratably, the sinking fund and its accumulations, less authorized expenditures out of the same, and that any surplus of the sinking fund remaining after redemption of the outstanding certificates was to be paid to the Railway Exchange Building Company.

"Plaintiffs state that the reversionary and redemptive rights so recognized, acknowledged and made contractual in said contract of April 2, 1912, belonged to the Hargadine-McKittrick Dry Goods Company, and that, although the parties to said contract sought in form to confer such rights upon said Dry Goods Company by ascribing to said Dry Goods Company the capital stock of the Railway Exchange Building Company, the said stock was not delivered into the possession or control of said Dry Goods Company, but, under the contract of November 15, 1911, hereinabove set out in substance, to which the Dry Goods Company was not a party, was deposited by the Syndicate Managers with the trustee for 'forty years,' with irrevocable power to vote the same at all corporate meetings, and plaintiffs say that the control, management, manipulation, contractual rights, interests, obligations and benefits represented by said stock were at all times in the hands of said Syndicate, Syndicate Managers and trustee, who were charged with the trust and duty of preserving the said interests of the Dry Goods Company and its stockholders, and that neither they nor any of agencies, Annuity Realty Company (whose existence is to cease when the certificates are paid) or Annuity subscribers (certificate holders), or Railway Exchange Building, Incorporated, or its bondholders,

could acquire an interest in said reversionary or redemptive rights adverse to the equitable interest and title of the Dry Goods Company, whatever transpired as to the said stock of the Building Company, the form of preserving said rights being, in equity, subordinate to the substance thereof, and none of said agencies having any will or individuality aside from said Syndicate Managers and their syndicate.

"Plaintiffs further allege that the sublease from the Annuity Realty Company to the Railway Exchange Building, Incorporated, contains the same terms and provisions, and is in form identical, including provisions for sinking fund, with that of the lease of April 1, 1912, to the Railway Exchange Building Company, and that by the sublease to the Railway Exchange Building, Incorporated, the lessor, lessee and bondholders sought to preserve their relative and respective interests unchanged by the substitution of the Railway Exchange Building, Incorporated, in place of the Railway Exchange Building Company as sublessee; that the bondholders of the Railway Exchange Building Company bonds became, by transposition and substitution of their respective holdings, without consideration, the bondholders in like amount as before of the Railway Exchange Building, Incorporated, and plaintiffs' rights are thereby likewise preserved *in statu quo.* Plaintiffs aver that neither the Annuity Realty Company, nor the sublessee, nor the bondholders, nor the trustee, nor any other person or corporation, acquired any rights in the reversionary title or redemptive right defined in said contract of April 2, 1912, in the process of changing designated sublessees, and that the rights of the Hargadine-McKittrick Dry Goods Company were not affected or impaired by such process or change. . . .

"Plaintiffs aver that, the premises considered, if, for any reason, the court finds that plaintiffs are not entitled to have a present lien established in favor of Hargadine-McKittrick Dry Goods Company, and in behalf of its stockholders prior and paramount to any and all property rights, claims or liens of the defendants or any of them (other than the said Dry Goods Company), then plaintiffs are entitled to have the right declared and established by decree in the Hargadine-McKittrick Dry Goods Company, and in behalf of its stockholders, to have, hold and enjoy the leasehold interests or estates in said block 128, now held and claimed in the name of the Annuity Realty Company, after the Annuity certificates are fully paid and retired from accumulations of said sinking fund or in any manner or after said Annuity certificates are purchased or redeemed at 110 per cent, or at such lower figure as shall be acceptable to said certificate-holders and fair and just in accord with said contract writing of April 2, 1912, and to be vested with such reversionary estate and redemptive right subject to such sublease as may be rightfully outstanding."

The prayer is: That a lien be declared in favor of plaintiffs superior to the rights of defendants; or, if such superior lien be refused, that plaintiffs be declared the owners of the reversionary or redemptive right, subject to the rights of the Annuity certificate holders.

Each of the defendants demurred: a common ground of their demurrers is that the cause of action alleged, if any, is barred by the Statute of Limitations.

The first question to arise on the demurrer is: What is the cause of action alleged, or attempted to be alleged, in the petition? A brief recapitulation of the facts seems necessary.

Thomas H. McKittrick, prior to November, 1911, invested $2,-739,000 of the Dry Goods Company's funds in the acquisition and preservation of certain leaseholds. He acquired these leaseholds for the purpose of erecting thereon a suitable building, and in their acquisition had become obligated to do so. Such a building as he purposed to erect would cost approximately $4,250,000. The Trust Company devised the plan for the raising of this money through a syndicate and Jones and Filley were designated as Syndicate Managers to secure the money through the sale of Annuity Certificates and Building Company bonds; McKittrick, and the Dry Goods Company (which was the equitable owner of the leases), were to cause the leases to be transferred to the Annuity Company, and the Dry Goods Company, because it was the equitable owner, was to get all the stock of the Building Company therefor. The Building Company was to be the beneficial owner of the leaseholds and building, subject only to the new indebtedness created for Annuity Certificates and Building Company bonds. When the Annuity Certificates were paid off or redeemed, the Annuity Company was to transfer the underlying leases to the Building Company, and when the Building Company's bonds also were paid off, then the Building Company would own the leaseholds and building, free and clear, and the Dry Goods Company owned all the stock of the Building Company. These plans were all carried into execution, except the Annuity Certificates and the bonds were never paid or redeemed. In 1924 the Building Company was adjudged bankrupt, and all of its assets, including the equity of redemption in the leaseholds, were sold at a sale in bankruptcy. Thereby the lien and (or) the redemptive right referred in the petition, which the Dry Goods Company had through its ownership, of the Building Company's stock, were lost to it.

The foregoing are the facts as they appear from surface indications, so to speak. Now the real facts: McKittrick "wrongfully and without authority took and diverted" from the treasury of the Dry Goods Company the sum of $2,739,000 and used the same in the purchase of leaseholds. Thereupon the equitable title

to the leaseholds, by operation of law, vested in the Dry Goods Company. The contract of November 24, 1911, whereby the Dry Goods Company purported to transfer to the Annuity Company its equitable title to the leaseholds and to receive in exchange therefor the stock of the Building Company, was fraudulent and void. Said contract, the only one purporting to have been entered into by the Dry Goods Company as a party, did not therefore effect a transfer of its beneficial interest in the leaseholds to the Annuity Company. Consequently, the Annuity Company never had anything but the naked legal title to the leaseholds, which it acquired from McKittrick's dummy companies. It therefore conveyed nothing of substance in its lease to the Building Company, and as a further consequence the latter's mortgage given to secure its bonds conveyed nothing. All parties to the transactions had with respect to the subject-matter, according to the petition, had actual knowledge, or were chargeable with notice, of the Dry Goods Company's undivested and unimpaired equitable title to the leaseholds. The several contracts imposed various trusts on the Syndicate Managers, on the St. Louis Union Trust Company and on the Annuity Realty Company, and there are allegations in the petition to the effect that under certain situations which arose the Trust Company and the Annuity Company were under the duty by reason of such trusts to protect the Dry Goods Company's equitable title to the leaseholds. But the claim that any such duty existed must necessarily rest on the assumption that the Dry Goods Company had transferred its title to the Annuity Company—to be used by it as the basis for financing under the Trust Company's direction the construction of the Railway Exchange Building; and *that* the petition explicitly and emphatically denies. All the agreements, including the trust provisions, so far as the Dry Goods Company was concerned, were empty and without subject-matter. They and the corporate forms employed were designed, according to the petition, as a mask for the wrong and fraud perpetrated, and intended to be perpetrated by the defendants in "the draining of the assets of the McKittrick Company out of the treasury of said Company and away from its shareholders." But notwithstanding the juggling, and the attempted transmutations, the Dry Goods Company's equitable interest in the leaseholds which resulted to it by operation of law remained undisturbed and unaffected.

From a painstaking consideration of the long historical narrative called the petition, containing a great mass of legal conclusions and matters which are either evidentiary or wholly irrelevant, we conclude that it sets up with respect to the leaseholds a resulting trust in favor of the Dry Goods Company, and seeks to have it enforced. The bill as a whole proceeds on the theory that through the wrongful diversion of the funds of the Dry Goods Company from

authorized corporate purposes into the leaseholds a resulting trust as to the leaseholds arose in its favor.

Appellants (plaintiffs) contend in their brief and argument that the resulting trust in favor of the Dry Goods Company became metamorphosed into an express trust. They say: "The Syndicate Managers took over the title and owned and controlled as principals the whole property and enterprise. They thus became trustees and were bound to deal with the Hargadine-McKittrick Dry Goods Company as fiduciaries during the continuance of the relation." This position is taken evidently for the purpose of avoiding the bar of the Statute of Limitations. But certainly the Syndicate Managers never acquired title to the Dry Goods Company's equitable interest in the leaseholds unless the contract of November 24, 1911, made in its name, was valid and binding on it. If that contract was effective as to it, then in conjunction with McKittrick and his dummy corporations it passed the full title to the leaseholds to the Syndicate Managers to be conveyed by them to the Annuity Company, and agreed to take stock in the Building Company in exchange for its equitable interest so conveyed. Thereupon the resulting trust came to an end. Brushing aside mere forms, the Dry Goods Company became the absolute owner of the leaseholds. Through the contract of November 24, 1911, if valid as to it, it in effect ratified McKittrick's actions in purchasing the leaseholds and stepped into his shoes for the purpose of carrying into execution the plan to erect a building thereon. The Syndicate Managers, the Annuity Company, the Trust Company and the Building Company were the devices employed by it to enable it to borrow from the public the money necessary for the construction of the building. Through these instrumentalities it mortgaged its leaseholds. After having erected the building and enjoying its use for a number of years, its *alter ego*, the Building Company, became bankrupt, and through a sale in bankruptcy of the latter's assets the Dry Goods Company lost its equity of redemption in the leaseholds. The Annuity Company and the Trust Company were mere creatures of the Dry Goods Company; they had not been provided with the means to prevent the insolvency of the Building Company; nor were they under any duty to advance the moneys required to prevent its bankruptcy. Realizing that the recovery sought could not be had on the theory of an express trust, plaintiffs in their petition clung tenaciously to the original resulting trust.

If the conclusion announced in a preceding paragraph is the correct one, the action is one to recover for the Dry Goods Company, through an implied trust, an equitable interest in real estate. The cause of action accrued to the Dry Goods Company, and the right to sue thereon in its behalf inured to plaintiffs, in 1911. As forecast, the Statute of Limitations is applicable to implied trusts,

whether constructive or resulting: The particular statute applicable to an implied trust through which a recovery of an interest in lands is sought is the one which limits to ten years the time within which real actions may be commenced. [Hudson v. Cahoon, 193 Mo. 547, 91 S. W. 72; Reed v. Painter, 145 Mo. 341, 46 S. W. 1089.] This action not having been commenced until the 27th day of December, 1924, was at that time clearly barred. [Sec. 1304, R. S. 1919.] It follows that the demurrers were well ruled by the circuit court. Its judgment is affirmed. All concur.