## FRANCES MARIE JACKS, by LEWIS JACKS, Her Next Friend, Appellant, v. JOHN W. LINK et al.

Division Two, December 31, 1921.

1. **EQUITY: Incompetent Evidence: Appellate Practice.** Incompetent testimony admitted on the trial of a suit in equity will not work a reversal of the judgment on appeal, but will be disregarded and such a judgment rendered as in equity and good conscience the pleadings and competent evidence may authorize.

2. **RESULTING TRUST: Character of Proof.** Parol Proof to establish a resulting trust in real estate must be so strong, cogent and convincing as to leave no doubt in the mind of the chancellor as to the creation of the trust.

3. ———: **Stale Claim.** Courts do not look with favor upon a claim to a resulting trust in lands of many years' standing which might well have been established by a more timely suit.

4. ———: **When It Arises.** If a resulting trust arose in favor of the wife because her money was used by her husband 'to pay for the land it arose when the deeds to him were made.

5. ——: **Borrowed Money.** If the only evidence to establish the resulting trust in real estate in favor of the grantee's grandchild is that when he bought the land he borrowed a portion of the purchase money from his wife's father, gave his notes therefor, and after the payee's death, in a friendly distribution of the personal assets of the estate, those notes were given to the said grantee in the wife's presence, such a trust in the lands in favor of said grandchild, the lineal descendant of the grantee's said wife, cannot be declared.

6. ——: **Incompetent Evidence: Matters Relating to Attempted Compromise.** Negotiations and correspondence between attorneys, and an unsigned deed of trust, all constituting matters occurring in the course of an attempt to compromise and settle plaintiff's claim to a resulting trust in lands conveyed to defendant, are not competent evidence tending to define the transaction.

7. ——: **Loan.** Where all the evidence indicates that the transaction by which defendant borrowed money from his father-in-law to buy land was a loan and continued ever afterwards to possess only the character of a loan, a resulting trust in said land did not arise in favor of his wife's decendants.

Appeal from Platte Circuit Court.—*Hon. Alonzo D. Burns*, Judge.

AFFIRMED.

*George W. Day* and *T. C. Sparks* for appellant.

(1) The court erred in admitting the testimony of John W. Link as to the ownership of the purchase money, and in permitting him to testify that he borrowed it from James Madison Payton, deceased. Miller v. Slupsky, 158 Mo. 646; Danciger v. Stone, 210 S. W. 865; Rice v. Shipley, 159 Mo. 405; Bryant v. Shinnabarger, 227 S. W. 57; McCormick v. Parsons, 195 Mo. 91, 100; Carpenter v. Coats, 183 Mo. 57, 60; Wren v. Sturgeon, 184 S. W. 1036; Galvin v. Knights, 169 Mo. App. 496, 513; Coughlin v. Haussler, 50 Mo. 128; Bishop v. Investment Co., 229 Mo. 699, 723; Elsea v. Smith, 273 Mo. 396, 407; Leavea v. Railroad, 171 Mo App. 24, 266 Mo. 151, L. R. A. 1916D, 810. (2) The court erred in its finding and decree on plaintiff's cause of action that on the whole

evidence plaintiff was not entitled to a resulting trust in the land described. Rice v. Shipley, 159 Mo. 407; Fogle v. Pindell, 248 Mo. 74; Freeland v. Williamson, 220 Mo. 232; Stevens v. Fitzpatrick, 218 Mo. 723; Ferguson v. Robinson, 258 Mo. 129; Shaw v. Shaw, 86 Mo. 594; 15 Am. & Eng. Ency. Law (2 Ed.) pp. 1142, 1150; Long v. Long, 192 S. W. 948; Hall v. Hall, 107 Mo. 109; Darrier v. Darrier, 58 Mo. 226; Trust Co. v. Rudolph, 136 Mo. 173; Gunn v. Thurston, 130 Mo. 345; Holman v. Holman, 183 S. W. 623; Brook v. Latimer, 44 Kan. 431, 11 L. R. A. 805, 807; Strode v. Beall, 105 Mo. App. 495; Peabody v. Peabody, 59 Ind. 556; 1 R. C. L. p. 668, sec. 20; Zaring v. Bauman, 223 S. W. 947; Plowman v. Nicholson, 81 Kan. 215; Clowser v. Noland, 133 Mo. 230. (3) The court erred in holding that the purchase money was not furnished by Ardelma Link, wife of respondent John W. Link, as a part of the original transaction of purchase of the respective tracts of land. Authorities cited above.

*Guy B. Park* and *A. D. Gresham* for respondents.

(1) The proof in this case falls far short of the kind and character of proof necessary to establish a resulting trust. Evidence to establish a resulting trust must be so clear, strong and convincing as to leave no reasonable doubt in the mind of the chancellor as to the existence of the trust. Williams v. Keefe, 241 Mo. 366; Easter v. Easter, 246 Mo. 409; Waddell v. Frazier, 245 Mo. 391; Deer v. Deer's Estate, 180 S. W. 572; King v. Isby, 116 Mo. 155; Reed v. Spery, 193 Mo. 167; Morris v. Clare, 132 Mo. 232; McKee v. Downing, 224 Mo. 115. (2) There is no evidence that, at the times of the purchase of the lands in question, any advancement was made or intended to be made by her father to Ardelma Link, or that any of her money went into the lands. The money was loaned to John W. Link. In order to establish a resulting trust it is absolutely indispensible that the payment should be actually made by the beneficiary,

Jacks v. Link.

or that an absolute obligation to pay should be incurred by him, as a part of the original transaction of purchase, at or before the time of the conveyance; no subsequent, and entirely independent conduct, intervention or payment on his part would raise any resulting trust. Weiss v. Heitkamp, 127 Mo. 23; Sell v. West, 125 Mo. 621; Kelly v. Johnson, 28 Mo. 249; Blake v. Blake, 226 S. W. (Mo.) 837.   (3)   If defendant, John W. Link, was disqualified to testify concerning transactions with deceased, it does not follow that he was not competent to testify concerning other matters. The disqualification imposed by Sec. 5410, R. S. 1919, is not general, but is limited to transactions between the witness and the party then dead. Elsea v. Smith, 273 Mo. 396; Weiermueller v. Scullin, 203 Mo. 466; Hamra v. Orten, 233 S. W. 495. (4)   Plaintiff's exhibits and the evidence of witnesses, Coots and Day, relative thereto were not admissible in evidence because they were made in the course of negotiations for a compromise or settlement of the demands made by plaintiff upon defendant. The law favors compromises, and seeks to afford parties full opportunity and free latitude in that behalf by rendering them secure under the principle relevant to privileged communications. Landsbaum v. Realty Co., 226 S. W. 604; Cullen v. Ins. Co., 126 Mo. App. 412; Rusher v. City of Aurora, 71 Mo. App. 418; Sterrett v. Met. St. Ry. Co., 225 Mo. 115; Engel v. Powell, 154 Mo. App. 233, 238. The deed of trust was not signed by defendant. He had not seen it. He did not know its contents. He had not authorized Coots to prepare and submit a deed of trust containing a statement that Ardelma Link had money invested in the lands.   (5)   But even if the letters and unexecuted deed of trust offered in evidence by plaintiff were admissible for the purpose of showing admissions of defendant Link, at most they show the admissions of a legal conclusion and not facts. A party may admit a fact, but not a legal conclusion. Pitts v. Weakley, 155 Mo. 141; State ex rel. v. Smith, 150 Mo. 75.

WALKER, J.—This is a suit brought in the Circuit Court of Platte County to establish a resulting trust. There was a judgment below for the respondents, from which appellant has perfected an appeal to this court.

The appellant—a minor—brought this action by her father as next friend against her grandfather, the respondent first named, joining therewith a number of others deemed necessary to a final determination of the matter at issue.

Appellant is the only child and heir of Mallie M. Jacks, deceased, daughter of the respondent John W. Link and his wife Ardelma Link, deceased. The latter was a daughter of James M. Payton, now deceased. This action was instituted in 1919, seventeen years after the death of James M. Payton.

The petition, in equity, contains two counts and prays that one hundred and sixty acres of land in Platte County, the record title of which is in the respondent John W. Link, be impressed with a resulting trust in favor of the appellant as an heir of Ardelma Link, it being alleged that a portion of the purchase price of the land had been furnished by appellant's grandmother, Ardelma Link, in that it had been advanced to John W. Link, her husband, to enable him to purchase the land, by James M. Payton, the father of said Ardelma.

The land was conveyed to the respondent John W. Link by two separate deeds: one, conveying one hundred and forty acres; the other, twenty acres, at different times, and hence the two counts in the petition. It is claimed that of the purchase price of the one hundred and forty acre tract, seven hundred dollars of same was advanced by James M. Payton to his daughter Ardelma Link and that nine hundred and fifty dollars, advanced in like manner, was used in the payment for the twenty acres.

The relevant facts will be stated in their order in the discussion of the assignments of error.

It is contended that error was committed in the admission of the testimony of John W. Link as to the ownership of the purchase money of the land and in permitting him to testify that he borrowed it from his father-in-law, James W. Payton. This contention may be disposed of under the general rule that where improper testimony has been admitted in an equitable proceeding in which we are required to review the entire record, the judgment will not be reversed on that ground, but the incompetent testimony will be disregarded and such a judgment rendered as in equity and good conscience the pleadings and evidence may authorize. [Bryant v. Shinnabarger, 227 S. W. (Mo.) 54 and cases p. 57; McKee v. Downing, 224 Mo. 115; McCormick v. Parsons, 195 Mo. l. c. 100 and cases; Rice v. Shipley, 159 Mo. l. c. 407; Miller v. Slupsky, 158 Mo. 643.]

*Incompetent Evidence.*

Regardless, therefore, of the errors that may have been committed by the trial court in its rulings upon the admissibility of the testimony, the case is before us for review and determination upon whatever evidence of probative force appears in the record.

Lewis Jacks, the father of the appellant, testified that John W. Link came to his (witness's) home in 1901, while James M. Payton was staying there and said to the latter that he wanted to get seven hundred dollars to pay on the Burkhead land (in controversy), which he, Link, was about to purchase.

There was testimony that this amount of money was soon thereafter obtained by John W. Link from James M. Payton, and that the former gave his note to the latter for the amount stated.

George W. Day, counsel for the appellant, testified that sometime before this suit was brought he wrote to John W. Link, who came to his office and they had a talk about the matter involved in this controversy. Witness's testimony is substantially as follows: "I can't repeat all the conversation we had there, but Mr. Link told me that I should go and see Judge Coots" (the Probate Judge

of Platte County) "and whatever he said was right for him to do, he would do. Further than that, we discussed the merits of the matter in a general way, and Mr. Link denied that there was any obligation on his part to the young lady, Frances Marie Jacks, the plaintiff. Sometime after that I saw Judge Coots and had a talk with him about the matter; I can't state all or perhaps even the substance of what was said. Mr. Link was not present during that conversation. The conversation with Mr. Link was in connection with settling this controversy. Judge Coots told me that as he viewed the matter there was a resulting trust in favor of this plaintiff, growing out of the fact that Mrs. Link's money had gone into this land, and he asked me to write a letter to Mr. Link, asking him to call upon him (Judge Coots), and that he would let me hear from him after he had seen Mr. Link. He asked me to write Mr. Link instead of writing him, because he said that whatever he was doing there he was doing as a friend of Mr. Link, and not as an attorney. Possibly this is an inference of mine, but I think Judge Coots said that it was as a friend and not as an attorney that he was acting. I wrote a letter to Mr. Link in April, 1918, and asked him to call upon Judge Coots, and in the same month I received a letter from Judge Coots, dated April 13, 1918."

This letter was introduced in evidence on the theory, we presume, that Judge Coots was acting as the agent of John W. Link. The portion of same relevant to the matter at issue, omitting the signature of the writer, is as follows:

"Mr. J. W. Link came in to see me to-day, and I had quite a talk with him. He says that his wife's father advanced him enough money to make a payment on the land he owns and he gave a deed of trust for the balance. He cannot now give the exact amount advanced, but thinks it was in the neighborhood of $2,000. His wife received about a thousand dollars at her father's death, but she spent most of this, very little of it being paid on the

mortgage. He thinks he can get the figures for the exact amounts.

"It seems that probably the facts in the case would create a resulting trust in favor of the wife or her heirs, but in any event, he would be entitled to hold the land as tenant by the curtesy for life. I told him that I thought all parties would be satisfied if he would execute some kind of a trust against the land for the use and benefit of his grandchildren, so that they might feel that no matter what turn his affairs might take, they would at least have secured the amount that came to his wife, to be paid them at his death. He seems willing to execute such a trust if it will be satisfactory to the grandchildren. I am sure he is willing to do what is right in the matter."

On August 26, 1918, witness received from Judge Coots a letter, the subject-matter of which is as follows:

"Mr. John W. Link came in to see me last Saturday, and agreed to secure all of the funds coming to his grandchildren from his first wife's estate by deed of trust on the 80 acres west of Linkville, worth at least $16,000. There is at present a small deed of trust against this land, which will be released as soon as he can collect enough from the sale of the other land to pay it off, thus making the deed of trust in favor of his grandchildren a first lien on the same. I have full confidence in Mr. Link's integrity of purpose and have no hesitation in saying that he will keep this promise.

"He says that his wife received all-told the sum of $2,700 from her father and his estate, and that he has given the piano to Marie at $300, thus making the total $3,000, so that she is to have only $700 in order to make them all equal.

"I have prepared a deed of trust, to cover his wishes and intention as nearly as I could draw it, and enclose same to you herewith. If this meets with your approval, kindly return to me and I will have him execute it and will have it recorded."

The testimony of Judge John W. Coots was as follows: "I am the Probate Judge of Platte County. I know the defendant John W. Link and have known him for a number of years. The letter of April 13, 1918, was written by me for Mr. Link, in which we were trying to compromise some matters between him and his son-in-law" (the father of the appellant). "Mr. Link came to me for advice in the matter. He seemed anxious to adjust it. He wanted to settle the controversy between him and his grandchildren. Mr. Day represented the young lady and I represented Mr. Link. We were trying to compromise the matter. Mr. Link wanted to settle it and he authorized me to make this offer. Mr. Link came to see me a number of times and the letter of April 13th was written as a result of the conversations I had with him. He wanted to reach some adjustment of the matters without litigation. I don't remember that he was denying all liability. He offered to do something, probably. I don't remember what is in the letter."

The witness, referring to the letter of April 13th, said: "Sometime prior to the writing of this letter, I had some conversation with Mr. Day, but I do not remember that in this letter I asked Mr. Day to write to Mr. Link and for him to come and see me. I do remember that prior to the writing of this letter Mr. Link came to see me. I don't know that this letter was written by me as the result of the conversation I had with Mr. Link at that time; I had a number of talks with Mr. Link. I don't think Mr. Link saw this letter after it was written. The letter written by me to Mr. Day August 26th was in reference to Mr. Link's talk with me. I suppose this letter was written immediately following a call on me by Mr. Link. I don't remember anything about the conversation now. Any statements I made in this letter were my understanding from my talk with him. I don't remember whether in that talk with Mr. Link anything was said by him about my communicating the facts he told me to Mr. Day, but if my letter says so, it must have been true."

There was enclosed with the letter of August 26th a form of deed of trust, intended to effect a settlement between John W. Link and the appellant. Concerning same, the witness said: "This was a deed of trust I prepared in an effort to settle this controversy between the parties, and I sent it to Mr. Day and told him that I could induce Mr. Link to execute this paper, if satisfactory, but my recollection is that Mr. Day said it was not satisfactory. This deed of trust was made in an effort to settle and compromise this difference, but it was not accepted. Mr. Day refused to accept it. I do not remember drawing but one deed of trust. I presume I got the data therein from Mr. Link, but I don't remember the conversation I had with him about it. It was in regard to this settlement. He told me what he was willing to do and I wrote it down that way. The statements of fact contained in this deed of trust are statements I made up from those made to me by Mr. Link. That was his offer as I understood it. They were made for the purpose of a full settlement. I do not know whether they were true or not. My recollection is that Mr. Link's contention was that there was nothing due to these children as long as he lived; that he was willing, though, to fix this so they would be perfectly secure in getting the money when he died. I put the statements in as an offer. I don't know whether they were true or not."

The deed of trust was offered in evidence. There was no testimony that it was ever seen by John W. Link until after the commencement of this proceeding.

Cross-examined, Judge Coots testified as follows:

"Mr. Day came to see me and told me he represented the plaintiff in this present case, the daughter of Mr. Jacks. When Mr. Day first talked to me about the matter, my recollection is that I told him my impression would be that if Mrs. Link's money went into the land, as part of the purchase money, she had a resulting trust in it. I don't think I had had any conversation with Mr. Link when I first talked with Mr. Day about it. I told him that

Mr. Link was a man I knew would do what was right, and not to bring any suit, or anything, until I could have a talk with him, because I thought we could adjust the matter.

"At the time of the conversation I am now talking about, I don't think I had had any conference with Mr. Link. I think the first thing I knew of it was from Mr. Day. I was not acting for Mr. Link at that time, and had had no conversation with him about it. At Mr. Day's instance, I took it up with Mr. Link.

"I couldn't remember what Mr. Link said about his having given his individual note to Mr. Payton for the purchase price when he bought the land in controversy; I don't remember what was said at all, but that has been in my mind, some way, but I don't know how I got it —at what conversation. I couldn't say that Mr. Link said that his wife did not sign the note, but that he paid the interest on the notes that were given for the purchase price of this land. That is my recollection. I understood that from some source, but I don't know how. I don't know what my talk with Mr. Link was. I don't remember that he stated that it wasn't until after the death of Mrs. Payton, the mother of Mrs. Link, that she came into possession of the notes, and had any interest in them. Neither do I remember if he said that those notes were given to her by the administrator of the estate of her father, Mr. Payton, but I think that is a fact.

"My recollection about Mr. Link's denial of liability to this girl is that he denied that he owed her anything, and that this offer was made only for the purpose of settling a dispute and controversy, and preventing a lawsuit. My advice to Mr. Link was, if a portion of his wife's money was put in the purchase money of the land, she would have a resulting trust to that extent; if she had a legal right to it, then as tenant by the curtesy, he would have a right to the whole business as long as he lived. In other words, there would be no liability against Mr. Link whatever for the use of the land as long as he lived.

I don't remember that Mr. Link ever at any time told me that any of his wife's money went into the purchase price of this land. I think, as well as I recollect, he borrowed the money from Mr. Payton.

"It is probably true that after Mr. Payton's death, his wife came into the possession of the note; I don't remember."

John W. Link testified in his own behalf that he borrowed a portion of the money used in the payment for the land from his father-in-law, James M. Payton, and that the remainder was his own; that none of his wife's money went towards the payment of the purchase price; that he never authorized Judge Coots to so state; that it was not true; that Mr. Payton at the time he died held two notes against the witness; that one of these was for seven hundred dollars; that this amount was loaned to him by Mr. Payton, and that he gave him his note for it, signed by himself; that it was expended in part payment for the one hundred and forty acres; that he got an additional thousand from Mr. Payton, which also went towards the payment of a portion of the land. For this amount, he also gave his note. After Mr. Payton's death, there was a private settlement between the heirs of his estate at his house. At that settlement the two notes were given to him; that his wife was present. That he was not present when the deed of trust was prepared by Judge Coots; that he dictated some of it to him and told him what he wanted him to do; that Mr. Day wrote him a letter that Mr. Jacks wanted some kind of a settlement; that the fact that witness had married a second time and might give his property to somebody else, and the child of Jacks and the other children wouldn't get anything, and they wanted something to show that witness wouldn't do that. That is why this contract was written. And he came to Mr. Coots and asked him to fix it, and let them know, if they were afraid of him giving the property away, he would let the eighty acres of land stand good for it until he was done with it, but

that he didn't owe them anything. There might have been some of this money belonging to his wife, but as far as Mr. Payton's money being in it, it is like he stated. Neither the seven hundred dollars nor the one thousand dollars was his wife's money. It was money he borrowed from Mr. Payton.

George Payton testified as follows:

"I am a brother of the wife of Mr. Link. I know something about his having given his notes to my father; I could'nt tell the amounts, but I know my father had his notes, possibly for seven hundred and nine hundred and fifty dollars. I suppose they were signed by Mr. Link. I think there were some notes signed by Mr. Link and his wife. I wouldn't swear to it, but that is what I think. I don't know what was done with the money. I don't know anything about the purchase of either of these tracts of land by Mr. Link. My father held notes against all of his children. I don't know of any of these notes ever being paid to my father. I didn't pay mine. I don't think the balance paid theirs. I don't think my father ever demanded that any of us pay him. Mr. Link never, to my knowledge, paid Mr. Payton or his estate any money on these notes. We had a private settlement of father's estate and the notes held against Mr. Link were turned over to him. He paid no money on that day so far as I know. These notes were turned over because they were counted part of their part of the estate. If Mr. Link ever paid one cent on it, I never heard of it. I took mine that way. So far as I know, all the other children did too. I couldn't tell whether there were two or four of the Link notes, but we gave my sister the interest on her husband's notes. I do not remember when my father died; it is about eighteen years ago."

The foregoing evidence embodies the substance of all of the testimony. While the admissibility of portions of it, under well-defined rules of evidence, is subject to objections, it has been set forth in full that a connected statement of same may enable it to be more

readily determined whether the claim of the appellant can be sustained. In pursuing this course, the rule must not be lost sight of that parol proof to establish a resulting trust as to realty must be so strong, cogent and convincing as to leave no doubt in the mind of the chancellor as to the creation of the trust. [Gammage v. Latham, 222 S. W. (Mo.) 469; Easter v. Easter, 246 Mo. 409; Williams v. Keefe, 241 Mo. 1. c. 374; McKee v. Downing, 224 Mo. 1. c. 144.]

Passing, without ruling upon the objections and exceptions to the admission and exclusion of testimony, to which we will give attention in determining what substantial evidence has been adduced, we find that the sufficiency of the evidence to sustain a decree in favor of the appellant to be the serious question.

If a trust resulted from this transaction, it did so when the deeds were delivered to John W. Link. [Blake v. Blake, 226 S. W. (Mo.) 1. c. 840.] One of the deeds was made and delivered to him in 1896—twenty-three years before the institution of this suit; and the other, in 1901—eighteen years prior thereto. While we will give all relevant testimony full consideration, in the light of the surrounding circumstances, to which it is entitled, without invoking the doctrine of laches, we may be permitted to add that courts do not look with favor upon a claim of this character of many years' standing which might well have been established by a more timely suit.

When John W. Link bought the land, he borrowed a portion of the money with which to pay the purchase price of same from James M. Payton, gave his notes therefor, which were found unpaid except the interest, among the latter's effects after his death. Without more, these notes must be considered as assets of Payton's estate. Further than this, there is no evidence from which the character of this transaction can be determined.

The negotiations, correspondence and unsigned form of deed of trust all constitute matters occurring in the course of an attempt to compromise and settle the ap-

pellant's claim, and should be excluded as testimony tending to define the nature of the transaction at bar. [Sterrett v. Met. Street Ry. Co., 225 Mo. 99; St. Louis Railroad Co. v. Continental Brick Co., 198 Mo. 698; Smith v. Shell, 82 Mo. 215; 22 C. J. p. 308, sec. 347.] This was evidently the view taken of this portion of appellant's testimony by the learned chancellor at the hearing below.

If the transaction between Link and Payton which gave rise to the making and delivery of the notes has been properly characterized as a loan, then all of the surrounding circumstances should point to the correctness of this conclusion; otherwise, reasons may exist for a different one. The conduct of the parties is not an unimportant feature in the consideration of these circumstances. James M. Payton died in 1902. Ardelma Link died fourteen years later, and Mallie Jacks, her daughter and the mother of appellant, survived her, yet during the years that intervened between the death of James M. Payton and their deaths, neither asserted any claim to the land or raised any question as to the construction we have placed upon the transaction. At the family settlement of the heirs of James M. Payton, the notes of John W. Link, as stated, were treated as debts due by him to the estate and were turned over to his wife. She was not charged with them as an advancement, and they became, if she saw fit to enforce their collection, debts due by her husband to her. Their character, if evidencing other than debts, was not changed by this surrender. That she may have chosen to forgive their payment does not concern this controversy.

This transaction, viewed in the light of a loan, presents other features in harmony with human experience. It is not unusual for a son-in-law when in need of funds when purchasing land or when engaging in any other business enterprise to borrow money from his father-in-law; no one, save possibly a father, is, as a rule, more willing to assist in the son-in-law's material welfare. If sufficient confidence is reposed in the son-in-law to thus assist, and there is no evidence militating against

that conclusion here, the simple, natural course would have been, as in making a loan to another, to take the borrower's note. If such confidence be lacking, then security would have been exacted or there would be present some proof of facts indicating this lack of confidence which might have been characterized by such a trust relation as is here claimed to have existed. There was no lack of confidence manifested and hence no room for another construction than that reached.

There is, therefore, in our opinion, no sufficient evidence to sustain appellant's claim. The intention of the parties is attested only by the evidence of a loan. Equity will neither create or enforce a trust contrary to the ascertained intention of the parties. [Haguewood v. Britain, 273 Mo. l. c. 92, and cases.]

The judgment of the trial court is, therefore, affirmed. All concur.